**DAYTON CHRISTIAN SCHOOLS, INC., et al., Plaintiffs-Appellants,**

v.

**OHIO CIVIL RIGHTS COMMISSION, et al., Defendants-Appellees.**

No. 84–3124.

United States Court of Appeals, Sixth Circuit.

Argued March 12, 1985.

Decided June 26, 1985.

**22.** Lujan does not argue on appeal that he is excused by the plain error doctrine. *See generally* Fed.R.Evid. 103(d).

**934**

Bruce E. Pence, Logothetis and Parks, Dayton, Ohio, William B. Ball (argued), Ball and Skelly, Philip J. Murren, Sandra E. Wise, Harrisburg, Pa., for plaintiffs-appellants.

Asst. Atty. Gen., Civil Rights Section, Columbus, Ohio, Helen M. Ninos (argued), Columbus, Ohio, for defendants-appellees.

Before CONTIE and MILBURN, Circuit Judges, and PECK, Senior Circuit Judge.

CONTIE, Circuit Judge.

Plaintiffs Dayton Christian Schools, Inc., et al. appeal the district court's order dismissing their complaint pursuant to 42 U.S.C. § 1983 seeking declaratory and injunctive relief from application of the Ohio Civil Rights Act, Ohio Rev.Code Ann. § 4112.01 *et seq.* (Page 1959).[1] Finding that the First Amendment to the United States Constitution proscribes application of the state statute in this context, we reverse.

**I.**

In January 1979, Linda Hoskinson, a teacher at Dayton Christian Schools (DCS), informed DCS Principal James Rakestraw that she was pregnant. When Rakestraw discussed this with DCS Superintendent Claude Schindler in February 1979, Schindler "instructed Mr. Rakestraw to write Mrs. Hoskinson a letter stating to her that because of our desire to have a mother home with pre-school age children, that she would not be issued a contract for the upcoming school year." On February 20, 1979, Rakestraw wrote such a letter to Hoskinson.[2]

After learning that she would not be rehired for the next school year, Hoskinson consulted an attorney who wrote to DCS threatening legal action for violation of state and federal statutes proscribing employment discrimination. On March 14, 1979, Hoskinson was terminated because she had consulted an attorney. In a letter dated March 27, 1979, the DCS Board rescinded the February 20 letter in which the Board declined to rehire Hoskinson and instead discharged her for failing to follow the Biblical Chain-of-Command.[3]

On March 28, 1979, Hoskinson filed a charge of sex discrimination with the Ohio Civil Rights Commission (OCRC) alleging

---

1. 578 F.Supp. 1004 (S.D.Ohio 1984).

2. The letter stated:
   My concern ... was ... that as you will be a new parent (June) your teaching next year would be in contrast to the School's philosophy. As a school, we see the importance of the mother in the home during the early years of child growth. This is a factor we consider as we interview prospective teachers. If there are pre-school age children in the home we recommend the mother stay there and do not accept her application.

3. The minutes of the Board meeting at which Hoskinson was terminated read as follows.

   The Board ... has concluded that there is a serious philosophical difference between the Hoskinsons and Dayton Christian Schools. This has been evidenced by violation of paragraph 13, contained in the contract between Linda Hoskinson and Dayton Christian School dated April 17.
   Paragraph 13 refers to the Chain-of-Command concept which DCS construed as prohibiting Hoskinson from consulting an attorney. Paragraph 13 provides:
   The teacher agrees to follow the Biblical pattern of Matthew 18:15–17 and Galations 6:1 and always give a good report. All differences are to be resolved by utilizing Biblical principles—always presenting a united front.

that the reason for her termination "was the school's belief that during the early years of a child's growth, the mother's place is in the home." On April 18, 1979, the OCRC requested information on the matter from DCS, and on May 14, 1979, informed DCS that a formal investigation had begun. On October 24, 1979, OCRC informed DCS that a hearing would be held on November 16 and requested information including employment data on Hoskinson, blank employment applications, employee handbooks and rules and regulations, job descriptions and model contracts, information about employee pregnancies, employee grievance procedures, and complete personnel files for more than a dozen DCS employees. On January 28, 1980, OCRC informed DCS that the Commission had found probable cause to believe that DCS had engaged in unlawful discrimination. The Commission found that "[e]vidence does not indicate that the Ohio Civil Rights Commission lacks jurisdiction over Respondent because it is a religious institution." Further, the Commission concluded that "[c]omplainant's discharge, and the reasons given for it by Respondent, were directly linked to the February 20, 1979 memo which stated that she would not be offered a contract because 'if there are pre-school age children in the home we recommend the mother stay there and do not accept her application.'" The Commission further suggested that the parties enter into a Conciliation Agreement and Consent Order. On April 18, 1980, the Commission issued a complaint against DCS and DCS answered asserting lack of jurisdiction due to the religious basis for the discharge.

On October 1, 1980, plaintiff-appellants, Dayton Christian Schools, Inc., Patterson Park Church, Christian Tabernacle, DCS Superintendent Claude Schindler, parents Stephen and Camillia House, and DCS teacher Paul Pyle brought this action pursuant to 42 U.S.C. § 1983 against the OCRC, five commissioners, the Ohio Attorney General, OCRC directors and two assistant attorney generals.[4] Plaintiffs sought a declaratory judgment that enforcement of the Ohio Civil Rights Act against DCS violated the First, Ninth and Fourteenth Amendments and an injunction to enjoin interference with plaintiffs' free exercise of their religious beliefs. Plaintiffs also argue that the State's attempt to exercise jurisdiction over the school and its hiring practices violated the Establishment Clause of the First Amendment.[5] On October 6, the district court granted a temporary restraining order restraining the OCRC from proceeding with a public hearing concerning DCS employment practices. The parties agreed to consolidate trial on the merits with a hearing on plaintiffs' motion for a permanent injunction pursuant to Fed.R.Civ.P. 65(a)(2). A one-day trial was held on December 8, 1980, and, on January 6, 1984, the district court entered an order dismissing the case and denying plaintiffs relief. On July 30, 1984, the district court entered an order granting plaintiffs' request for an injunction pending appeal pursuant to Fed.R.Civ.P. 62(c). 604 F.Supp. 101.

## II.

Our consideration of appellants' constitutional claims requires review of the facts regarding the nature of Dayton Christian Schools, the exercise of religion implicated in the OCRC's actions, and the statutory scheme from which DCS claims exemption. Of course, we recognize that "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Fed.R.

---

4. The Houses alleged that the Act "burdens and endangers the ability of parents to choose a religious education for their children." Pyle alleged that the Act "burdens and endangers the opportunity of religious teachers and administrators to carry out their religious vocation in the Christian formation and education of young people."

5. Appellants also asserted that the Act was unconstitutionally vague and overbroad. Since we find that the Act cannot be constitutionally applied to appellants, we do not address these arguments which were rejected by the district court. 578 F.Supp. at 1025–27.

Civ.P. 52(a); *Roemer v. Board of Public Works of Maryland,* 426 U.S. 736, 758, 96 S.Ct. 2337, 2350, 49 L.Ed.2d 179 (1976) (plurality). We make no effort to "duplicate the role of the lower court," but only consider whether "the district court's account of the evidence is plausible in light of the record viewed in its entirety." *Anderson v. City of Bessemer City,* — U.S. —, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985).[6]

## A.

█ The district court found that DCS has "a dominant religious purpose which permeates both the administrative and substantive aspects of the school." 578 F.Supp. at 1008–09. Further, the court found that

> [e]very aspect of the school's operation is geared toward exposing and educating the students on how to lead a Christian life by understanding what the members consider to be the guidance and direction provided by the Bible. As revealed in the testimony at the hearing on this matter and in the exhibits accepted into evidence, the teachers at DCS are selected because of their ability to blend their avowed religious beliefs into every lesson and school activity. Teachers are required to be born again Christians and to carry with them into their classes the

religious fervor and conviction felt necessary to stimulate young minds into accepting Christ as savior. Because of the emphasis placed on the religious education of the students, the school demands that teachers conform both in thought and conduct to the tenets and principles felt essential to leading a Christian life. The belief system espoused by the members of DCS touches every aspect of their life: work, interpersonal relationships, family and recreational activities. Deviation in any way from what is felt to be the proper religious way of life may cast doubt on a teacher's ability to perform his or her critical role and may, therefore, be grounds for dismissal.

578 F.Supp. at 1018–19.

DCS stated as its purposes "to teach all subjects in a manner to create in each student an awareness of God's Supreme authority over all creation" and "to train and prepare youth for worthy contributions to the Cause of Christ in the home, church and community." DCS Certificate of Consolidation.[7] "The major distinction of DCS is the fact that all truth is related and interpreted from God's viewpoint." Cover letter to applicants for employment. Both teachers and parents of DCS students must subscribe to the DCS Statement of Faith.[8]

---

6. Few of the district court's findings of fact are contested in this appeal. We review these facts to establish the basis for our rulings on the constitutional claims. *Roemer,* 426 U.S. at 758, 96 S.Ct. at 2350. With respect to the religious nature of DCS employment practices, we consider "the activities at issue by reference to objectively ascertainable facts concerning their nature and scope." *Tony and Susan Alamo Fdn. v. Secretary of Labor,* — U.S. —, 105 S.Ct. 1953, 1960–61, 85 L.Ed.2d 278 (1985). We note, however, that the OCRC does not cross-appeal challenging the district court's findings of fact. Therefore, we do not consider whether the district court erred in concluding that the religious beliefs in question were sincerely held or that DCS discharged Hoskinson because of those sincerely held beliefs.

7. The Preamble to the DCS Constitution provides:

> The Corporation will provide an educational curriculum of the highest possible standards

in order to prepare the student for purposeful Godliness in any vocation or entrance into institutions of higher learning. Further, as a regular part of the curriculum of the school(s) of the Corporation, each student will be taught Christian doctrine based on the Bible as the textbook authority for such instruction and learning.

This we do in obedience to God's Word, namely: to train children in the nurture and admonition of the Lord (Ephesians 6:4). Further, we recognize the necessity for the moral and spiritual development of our youth through Christian education in harmony with the Holy Bible.

8. The Statement of Faith provides:

> Each member of the Board of Directors and each member of the educational staff of the Corporation having accepted Jesus Christ as personal Savior, shall subscribe annually in writing to the following statement of Faith:
> 1. I believe the Bible to be the inspired and the only infallible authoritative Word of God.

Schindler confirmed that applicants who did not subscribe to the Statement of Faith would not be considered for employment. Further, Superintendent Schindler testified that "[o]ne parent in the family must be a professing Christian, must be born again. And the student in the school must be a Christian, or professing Christian." Testimony in the district court indicated that the parents' obligation to educate their children in accordance with Christian principles is biblically based.[9]

The religious focus of the school is reflected in the teacher selection process and concomitant role of the teacher in the school. Schindler testified that "[t]he

> 2. I believe that there is one God, eternally existent in three persons: Father, Son, and Holy Spirit.
> 3. I believe in the deity of our Lord Jesus Christ, in His Virgin Birth, in His sinless life, in His Miracles, in His vicarious and atoning death through His shed blood, in His bodily resurrection, in His ascension to the right hand of the Father, and in his personal return in power and glory.
> 4. I believe that man is sinful by nature and that regeneration by the Holy Spirit is essential for his salvation.
> 5. I believe in the continuing ministry of the Holy Spirit, by whose indwelling the Christian is enabled to live a Godly life.
> 6. I believe in the resurrection of both the saved and the lost. They who are saved unto eternal life and they who are lost unto eternal damnation.
> 7. I believe in the spiritual unity of believers in our Lord Jesus Christ.
> 8. I believe in the creation of man by the direct Act of God.

The DCS Constitution includes the following provisions. Art. III § 2 provides:

> Each member of the Board of Directors shall be a person known as a professing and exemplary Christian as prescribed in the Statement of Faith.

Art. V, § 1A provides:

> The Board of Directors shall [s]erve as spiritual leaders of the Corporation, waiting upon God for His direction and wisdom.

Art. VIII provides:

> All educational staff members must be members of a church having a doctrine which is in agreement with the Statement of Faith, must be scriptually sound in their teaching, and must lead exemplary Christian lives.

9. Superintendent Schindler, a minister, testified:
In the Bible, Deuteronomy, Chapter 6, verses 5 through 7, parents are commanded to diligently train their children to love Thy God

teacher's relationship with Jesus Christ and their life style is crucial to their subsequent employment at Dayton Christian Schools." Further, "[w]e feel that a teaching position is so crucial in our school and so vital to the performance of our ministry, that ... [b]efore we make the recommendation to the Board to hire our teachers, we must be in total harmony about that teacher's commitment to Christ and her life style and her ability to teach in our system."

Teacher Paul Pyle testified regarding his experience as a teacher at DCS.

> Then I begin each class with prayer. Sometimes I begin each class with a devotional thought, something that is

with all their heart, soul and mind every moment of the day. That command is given to parents. And we feel that the primary responsibility for the education is a parental responsibility. If you look at that verse, it basically indicates very strongly to us that there can be no separation between secular and sacred. We believe that all truth comes from God.
And, in fact, in John, Chapter 14, verse 6, it says—Jesus Christ himself said, "I am the way, the truth and the light. No man cometh unto the Father but by Me." So thus, we feel that the instruction we must give our children is there can't be any differentiation between secular and sacred, that God himself is the center of all aspects of learning and everything that's God's.
And thus, our mission at Dayton Christian Schools is, in essence, to be a servant to the home and to help mom and dad fulfill their Godly responsibilities to train their children to love God with all their heart, soul and mind.
And that being our mission, it then centers—then forms into the philosophy of education. And that philosophy is that our mission, our goal, is to help these young people become like Jesus Christ, to think like Him, to act like Him, by demonstrating their characters and qualities in their lives. We believe that is crucial, that a Christian becomes like Him. And thus, He becomes the focus in everything we do in our school. In fact, we believe that the Scriptures, in Proverbs 19:27, and many other passages, that I feel this way myself as a parent, but that I have no choice but to put my children into Christian schools where God is made paramount, that to do anything other than that would be a sin and would be wrong for me.
See also testimony of DCS Board Member Henkle.

fresh to me from the Scriptures that I have gotten that day or just recently. However, if I were to tell you that that would—was the extent of the religious activities during the day, that would be misleading. In my opinion, and in my endeavors in the classroom, the entire class period is given over to religious activities. I try to make sure that everything I do in someway adheres to Biblical principles that I have learned from the Bible through my being taught at Dayton Christian and through my own Bible studies. Could I go on and give an example?

Q  Sure.

A  For instance, when we are studying any literature, the thing I stress with my students in literature is all human thought can be tested within the absolute standards of the Scriptures. So we go through and discover the theme of that story in detail, to use the answer, test that to decide whether its true or false. And you can see that my putting the Scripture up as the ultimate authority comes through in the classroom day after day.

These facts support the district court's conclusion that DCS is a pervasively religious institution in which religious considerations permeate all aspects of the educational process, govern the teacher selection process, and dictate parents' entrustment of their children's education to the school.[10]

### B.

The Ohio Civil Rights Commission's complaint of discrimination implicates two asserted religious beliefs of appellants: the belief that a mother's place is in the home and the belief in a Chain-of-Command for resolving disputes among church members. We review the role of these beliefs in the appellant's religion to instruct our assessment of the constitutionality of the Ohio Civil Rights Act.

Superintendent Schindler testified:

We believe that the Bible teaches that even though we are equal in the sight of God, our role is different, the role of the female is different than that of the male. The Scripture teaches that in I Peter, Chapter 3; I Timothy, Chapter 2, Titus, Chapter 2, just to mention a few passages of the Scripture. And in those passages it spells out the role of a woman. And my counseling with Mr. Rakestraw is based upon those principles in God's words. And we felt they directly related to a woman being home with her pre-school age children. We rescinded the letter because after counseling we found that we had not adequately explained this to our faculty and to our staff. And thus Mrs. Hoskinson was not fully aware of the convictions of the administration and of the School Board relative to this particular Biblical principle.

Q  Was there any change on the school's position on this issue?

A  No, sir. We fell as strongly today about the Biblical principle as we did before rescinding this letter.

While Hoskinson was not aware of the church belief regarding teachers with pre-school age children and such philosophy was not specifically delineated, 578 F.Supp. at 1012, the philosophy, although biblically rooted, was known to Schindler primarily

---

**10.** DCS asserts that the district court committed clear error in finding that DCS was a "mere school" rather than a "church". While we recognize that different religious interests are at stake when a church rather than a school is involved, *Bob Jones University v. United States*, 461 U.S. 574, 604 n. 29, 103 S.Ct. 2017, 2035 n. 29, 76 L.Ed.2d 157 (1983); *EEOC v. Mississippi College*, 626 F.2d 477, 485 (5th Cir.1980), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981), and that different educational institutions may require differential treatment in protection of religious liberties, *Lemon v. Kurtz-*man (*Lemon I*), 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); *Tilton v. Richardson*, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), we find church/school labels unhelpful in our analysis, and, in fact, not dispositive of this case. The nature of the institution is sufficiently spelled out above and in the district court's opinion to allow consideration of the religious interests without reference to whether a church or school, or a teacher or minister is involved. Rigid schemes of analysis are particularly unhelpful in the First Amendment context.

from previous experiences with the school board.[11] Schindler testified that he instructed Rakestraw to write the letter to Hoskinson

> [b]ecause on further—past experiences I had been denied applications that I had presented to the Board where there was a mother with pre-school age children. I knew their philosophy and I knew it well, and I knew what their counsel would be to me.
>
> Q Was it your testimony that you had presented employment candidates to the Board on prior occasions but your recommendations were turned down because they had pre-school age children at home?
>
> A Yes, one specific application, yes sir.

The district court found that "the record supports the conclusion that, at least in the mind of Mr. Schindler, the nonrenewal of Mrs. Hoskinson's teaching contract was an act consistent with and compelled by religious beliefs." 578 F.Supp. at 1012. Further,

> [t]he Court cannot accept Defendants' contention that the initial decision not to renew Mrs. Hoskinson's contract was prompted solely by Mr. Schindler's per-

sonal philosophy and that, therefore, OCRC review of that decision could not even raise potential first amendment concerns. Though the belief may not be documented or as well known or accepted as other precepts discussed during the proceeding, the evidence clearly establishes that Mr. Schindler's conduct was based upon religiously founded principles. The Court does not feel it proper to relegate this personally held religious belief to an artificial lesser status of "personal philosophy" simply because the belief might not have been a clearly articulated tenet at DCS. The Court finds, therefore, that the initial decision not to renew Mrs. Hoskinson's teaching contract was founded on religious precepts and therefore falls within the ambit of the first amendment's protection afforded to the free exercise of religion. *Id.* at 1031.

The Chain of Command is a biblically based authority structure which depends on the internal peaceful resolution of differences.[12] The Chain of Command concept is related to the concept of giving a good report.[13] Hoskinson's contract included the following provision:

> tant that each teacher recognizes the authorities that have been placed over them, as well as we expect the students to recognize the authority the teacher has over them. And we expect them to respond to what is placed in front of them in the Teacher's Manual. But if they have a disagreement or do not concur with what is in the Policy Manual, they have an avenue open to them to come to us and discuss, according to Matthew, Chapter 18:15–17, and to air their concerns with reference to that particular policy. If they are not satisfied with that, they can—a procedure is established that they can go to the administrator and ultimately to the Board for resolving that particular conflict. Without that avenue open, we expect them to respond to what we ask them to do.

---

11. While no precise articulation of this belief is included in the school's literature, the importance of the family unit is readily apparent. DCS aims "[t]o develop both good and proper attitudes toward marriage and the family and also the understanding and skills needed to establish God-honoring homes." Educational Philosophy of Dayton Christian Schools. Likewise, Art. IV, § 1 of the Parent-Teacher Fellowship Constitution provides:

> This Fellowship believes that God has clearly established the husband/Father as the spiritual leader of the home and, as such, preserves the offices of the President and Vice President for men fulfilling their spiritual leadership responsibilities.

Further, the interview questions for teacher applicants asked:

> How do you perceive God's plan for the home —a) husband/wife, b) husband/child, c) mother/child.

12. Schindler testified:

> The way the Scriptures teach, the way we are to love God is by our obedience. And we know the Scriptures teach that in obedience, there's certain authority structures that He has established. And we feel that it's impor-

13. Schindler testified:

> Q And what's the purpose of having your staff sign a document such as Giving a Good Report?
>
> A We think it is a very important Scriptural principle and we also recognize that we are prone sometimes to forget about the principle. And so we have them sign it to remind

The teacher agrees to follow the Biblical pattern of Matthew 18:15–17 and Galations 6:0 and always give a good report. All differences are to be resolved by utilizing Biblical principles—always presenting a united front.

Further, Hoskinson wrote on her application for employment that "[o]bedience to those in authority over you is clearly stated in the Bible. I believe in God's chain of command."

The district court found that "Hoskinson was aware of the requirement that all teachers follow the Chain of Command prior to consulting her attorney and prior to her discharge." 578 F.Supp. at 1012. "The eventual discharge of Mrs. Hoskinson stemmed from the fact that she contacted an attorney in response to actions taken by the school regarding her employment." *Id.* at 1013.[14] The district court found that the Chain-of-Command concept "is both well articulated and generally held and ascribed to by the DCS staff and administration." *Id.* at 1032. The court concluded:

Thus, when the Board made the determination that Mrs. Hoskinson's contract should be terminated because of "philosophical differences" stemming from her taking her complaint about the nonrenewal of her contract to an attorney, this decision was consistent with the Board's expressed and established religious belief that disputes be resolved internally and in accordance with the Biblical Chain of Command.

*Id.*[15]

## C.

The Ohio Civil Rights Act, effective July 29, 1959, provides in pertinent part:

It shall be an unlawful discriminatory practice: (A) For any employer, because of the race, color, religion, sex, national origin, handicap, age or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

Ohio Rev.Code Ann. § 4112.02(A).[16] The Act also makes it unlawful

them of what they committing themselves to. We also have little cards that we place on their desks that reminds them, as well as a person that might be on the other side of the desk, that they are committed to this particular principle.
Q What is the principle of giving a good report?
A The principle of giving a good report means that I will not give a bad report about someone else to another party, nor will I listen to a bad report from someone else about that party, unless I am being asked, according to Matthew 18, to go as a witness. In other words, I will not receive a bad report about a teacher from a parent unless that parent has first made contact with the teacher and as a result of that contact is not satisfied, then I will go along that parent to the teacher to resolve it. If that doesn't resolve it, then the three of us, in turn, will go to our Board of Directors to resolve the conflict. That's what we call the chain of command, as specified in Matthew, Chapter 18.

14. Although DCS rescinded the memorandum of February 20 citing the policy on mothers with pre-school age children as the reason for not rehiring Hoskinson, this religious belief is relevant since the OCRC premises its exercise of jurisdiction in part on DCS's actions taken pursuant to that belief.

15. Whether or not adherence to a particular philosophy constitutes a religious belief entitled to constitutional protection is a question of fact. *Brown v. Dade Christian Schools, Inc.,* 556 F.2d 310, 314 (5th Cir.1977), *cert. denied,* 434 U.S. 1063, 98 S.Ct. 1235, 55 L.Ed.2d 763 (1978). Since the OCRC does not cross-appeal, the facts as found by the district court are accepted as established with respect to our consideration of the constitutional issues.

16. The statute defines "employer" as "any person employing four or more persons." Ohio Rev.Code Ann. § 4112.01(A)(2). Further, subsection (A)(1) provides that the term "[p]erson' includes one or more individuals, partnerships, associations, organizations, corporations, legal representatives, trustees, trustees in bankruptcy, receivers, and other organized groups of persons."
The statute provides that "the terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, any illness arising out of and occurring during the course of a pregnancy, childbirth or related medical conditions. Women affected by pregnancy, childbirth or related medical condi-

[f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful practice defined in this section, or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding or hearing under sections 4112.01 to 4112.07 of the Revised Code.

Ohio Rev.Code Ann. § 4112.02(I).[17]

The Act establishes the Ohio Civil Rights Commission, section 4112.03, to "[r]eceive, investigate, and pass upon written charges made under oath...." Section 4112.-04(A)(6). The statute empowers the OCRC to hold hearings, subpoena witnesses, administer oaths, and to require the production of books and papers. Section 4112.-04(B)(3). The Act further obligates the Commission, prior to a formal hearing, to "attempt, by informal methods of persuasion and conciliation, to induce compliance with" the Act. Section 4112.05(A). The Act authorizes the Commission, upon the filing of a charge, to initiate a preliminary investigation. Section 4112.05(B). If the Commission determines that it is probable that unlawful practices were engaged in and the Commission fails to secure voluntary compliance with Chapter 4112, the Commission may issue and cause to be served a complaint. *Id. See generally* Ohio Admin.Code § 4112. If after a hear-

ing, the Commission determines that unlawful practices have been engaged in it shall

cause to be served on such respondent an order requiring such respondent to cease and desist from such unlawful discriminatory practice and to take such further affirmative or other action as will effectuate the purposes of sections 4112.01 to 4112.08 of the Revised Code, including, but not limited to, hiring, reinstatement, or upgrading of employees with, or without, backpay....

Section 4112.05(G).

Ohio Rev.Code Ann. § 4112.06 provides for judicial review of Commission orders in the court of common pleas. While the court has the power to grant temporary relief and to enforce, modify, or set aside an order of the Commission, section 4112.-06(B), a party seeking judicial review is not entitled to *de novo* consideration. "The findings of the commission as to the facts shall be conclusive if supported by reliable, probative, and substantial evidence on the record...." Section 4112.06(E). Violation of section 4112.02(A) is a third-degree misdemeanor. Section 4112.99.

In this case, appellants instituted this action after filing of the charge, an attempted conciliation, the preliminary investigation, the finding of probable cause, and issuance of the complaint.[18]

---

tions shall be treated the same for all employment-related purposes...." Ohio Rev.Code Ann. § 4112.01(B).

Section 4112.02(E) is a list of prohibited practices in addition to those forbidden by other subsections of section 4112.02. The practices listed in subsection (E) are prohibited "[e]xcept where based on a bona fide occupational qualification certified in advance by the commission." No such exception is provided for violations of subsections (A) and (I), violation of which appellants are charged with in the complaint issued by the Commission.

**17.** While the statute, in section 4112.02(H), also proscribes discrimination in housing, the Act provides the following exception.

(K) Nothing in division (H) of this section shall bar any religious or denominational institution or organization, or any charitable or educational organization that is operated, supervised, or controlled by or in connection with a religious organization, or any bona

fide private or fraternal organization, from giving preference to persons of the same religion or denomination, or to members of the same religion or denomination, or to members of such private or fraternal organization, or from making such selection as is calculated by such organization to promote the religious principles or the aims, purpose, or fraternal principles for which it is established or maintained.

**18.** We note that the Ohio Civil Rights Act, while in some respects analogous to the employment provisions of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, differs in two critical ways. 42 U.S.C. § 2000e–1 provides:

This subchapter shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to

## III.

A statute "ought not be construed to violate the Constitution if any other possible construction remains available." *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 500, 99 S.Ct. 1313, 1318, 59

perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

While this section deprives the federal courts of jurisdiction in suits based on religious discrimination, *Dolter v. Wahlert High School*, 483 F.Supp. 266, 269 (N.D.Iowa 1980), the section has been held violative of the Establishment Clause and Equal Protection Clause to the extent it protects religious institutions from compliance with Title VII when engaged in secular activities, *King's Garden, Inc. v. FCC*, 498 F.2d 51, 55 (D.C.Cir.), *cert. denied*, 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974). Further, the section exempts religious institutions from actions for religious discrimination alone and not other types of actions for discrimination. *Dolter*, 483 F.Supp. at 269. It has been held that when an act of discrimination might constitute both religious and a non-exempt form of discrimination, the court may inquire whether a religious or non-religious basis for the discrimination existed. *Id.* at 270. This view is premised on the notion that separate and distinct causes for a single act can be isolated and does not comprehend the facts of the pending case wherein the alleged act of discrimination is taken pursuant to a religious belief and the state infers from that act a non-exempt form of discrimination.

The pending case is distinguished from the Title VII cases heavily relied on by the district court due to the absence of a parallel exemption in the Ohio statute and the particular facts of this case, involving an admittedly religious institution, engaged in a pervasively religious activity, and an asserted religious basis for the challenged employment practices. *See EEOC v. Pacific Press Publishing Assn.*, 676 F.2d 1272, 1279 (9th Cir.1982) (no religious basis asserted for wage discrimination); *EEOC v. Southwestern Baptist Theological Seminary*, 651 F.2d 277, 286 (5th Cir.1981), *cert. denied*, 456 U.S. 905, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982); *EEOC v. Mississippi College*, 626 F.2d 477, 488 (5th Cir. 1980). Likewise, see *McClure v. Salvation Army*, 460 F.2d 553, 558 (5th Cir.), *cert. denied*, 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972); *Russell v. Belmont College*, 554 F.Supp. 667, 677 (M.D.Tenn.1982); *Ritter v. Mount St. Mary's College*, 495 F.Supp. 724, 729 (D.Md. 1980); *Whitney v. Greater New York Corporation of Seventh Day Adventists*, 401 F.Supp. 1363, 1368 (S.D.N.Y.1975).

In addition, 42 U.S.C. § 2000e–2(e)(2) provides: Notwithstanding any other provision of this subchapter, ... it shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of learning to hire and employ employees of a particular religion if such school, college, university, or other education-

al institution or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion.

The Ohio statute likewise contains no such exemption. State employment discrimination laws enacted after the passage of the Civil Rights Act of 1964, unlike the Ohio statute (effective July 29, 1959), generally include an exemption for religious discrimination by religious institutions. In this circuit, *see* Ky.Rev. Stat. § 344.090(2), (3) (1966); Mich.Comp.Laws Ann. § 37.2403 (1977); Tenn.Code Ann. § 4–21–109 (1978). Statutory exemptions usually appear as either a provision parallel to 42 U.S.C. § 2000e–1, Ariz.Rev.Stat.Ann. § 41–1462 (1974); Neb.Rev.Stat. § 48–1103 (1965); Nev.Rev.Stat. § 613.320(2) (1965); Tex.Civil Code Ann. art. 5221K § 5.06(1) (Vernon 1983), a provision parallel to 42 U.S.C. § 2000e–2(e)(2), Ariz.Rev.Stat. Ann. § 41–1463(F)(2) (1980); D.C.Code Ann. § 1–2503 (1977); Hawaii Rev.Stat. § 378–3(5) (1984); Md.Ann.Code art. 49B, § 16(g)(3) (1978); Mass.Gen.Laws Ann. ch. 151B, § 4(15) (1980); Neb.Rev.Stat. § 48–1108 (1965); N.H. Rev.Stat.Ann. § 354–A:8(IV) (1979); N.J.Stat. Ann. § 10:5–12(a) (1981); N.M.Stat.Ann. § 28–1–9(B) (1975); N.Y.Executive Law § 296(11) (McKinney 1984); Nev.Rev.Stat. § 613.350(4) (1981); Okla.Stat.Ann. tit. 25, § 1308(2) (1981); Or.Rev.Stat. § 659.020(2) (1977); Pa.Stat.Ann. tit. 43, § 955 (Purdon 1982); S.C.Code Ann. § 1–13–80 (Law Co-op. 1979); S.D.Comp.Laws Ann. §§ 70–13–18, –22 (1972, 1981); Tex.Civil Code Ann. art. 5221k § 5.07(a)(2) (Vernon 1983); Utah Code Ann. § 34–35–6(2)(b) (1979); Wis.Stat.Ann. § 111.337(2)(a) (West 1983), a provision parallel to 42 U.S.C. § 2000e–2(e)(1), Conn.Gen.Stat.Ann. § 46a–60 (1982); Fla.Stat. Ann. § 760.10(8)(a) (1981); Hawaii Rev.Stat. § 378–3(2) (1984); Idaho Code § 18–7303 (1972); Iowa Code Ann. § 601A.6(5)(d) (West 1978); Minn.Stat.Ann. § 363.02(1), (2) (West 1984); Okla.Stat.Ann. tit. 25, § 1308(1) (West 1981); Vt.Stat.Ann. tit. 21, § 495(a) (1981), or as a definition of "employer" which excludes religious employers, Colo.Rev.Stat. § 24–34–401(3) (1979); Del.Code Ann. tit. 19 § 710(2) (1970); Ill.Ann.Stat. ch. 68, § 2–101(B)(2) (Smith-Hurd 1983); Ind.Code Ann. § 22–9–1–3(h) (West 1978); Kan.Stat.Ann. § 44–1002(b) (1975); La. Rev.Stat.Ann. tit. 23, § 1006(A)(2) (West 1984); Me.Rev.Stat.Ann. tit. 5, § 4553(4) (1975); Mass. Gen.Laws Ann. ch. 151B, § 1(5) (West 1979); Mo.Ann.Stat. § 296.010(2) (Vernon 1978); Mont.Code Ann. § 49–2–101(8) (1979); N.H. Rev.Stat.Ann. § 354–A:3(V) (1975); Pa.Stat.Ann. tit. 43, § 954(b) (Purdon 1982); R.I.Gen.Laws

L.Ed.2d 533 (1979); *St. Martin Evangelical Lutheran v. South Dakota*, 451 U.S. 772, 780, 101 S.Ct. 2142, 2147, 68 L.Ed.2d 612 (1981). *See Tilton v. Richardson*, 403 U.S. 672, 676–77, 91 S.Ct. 2091, 2094–2095, 29 L.Ed.2d 790 (1971). However, this rule of construction does not "license a court to usurp the policy-making and legislative functions of duly-elected representatives." *Heckler v. Mathews*, 465 U.S. 728, 104 S.Ct. 1387, 1396, 79 L.Ed.2d 646 (1984). In seeking an alternative construction we must determine first, whether the exercise of jurisdiction by the OCRC "would give rise to serious constitutional questions," and, second, if so, whether there is clear expression of affirmative legislative intent to so extend the Commission's jurisdiction. *Catholic Bishop of Chicago*, 440 U.S. at 501, 99 S.Ct. at 1319; *Tony and Susan Alamo Fdn. v. Secretary of Labor*, —— U.S. ——, 105 S.Ct. 1953, 1960 n. 18, 85 L.Ed.2d 278 (1985).

Although the parties plainly cannot consent to jurisdiction, the parties agree, and the district court had little trouble concluding, that exercise of jurisdiction by the Commission implicates serious constitutional questions. While we need not resolve the merits of the constitutional claims at this preliminary stage of inquiry, we note that "[t]he values enshrined in the First Amendment plainly rank high 'in the scale of our national values.'" *Catholic Bishop*, 440 U.S. at 501, 99 S.Ct. at 1319. The facts of this case set against the governing principles and objectives of neutrality and accommodation inherent in the First Amendment's protection of religious belief reveal the "significant risk that the First Amendment will be infringed." *Id.* at 502, 99 S.Ct. at 1319. With respect to appellants' Free Exercise Clause claim, the Court has repeatedly recognized parents' special interest in guiding and providing the education of their children consonant with their own religious beliefs. *Norwood v. Harrison*, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973); *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15

(1972); *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925). While the state's interest in eliminating employment discrimination based on sex is entitled to deference and respect, *Roberts v. United States Jaycees*, —— U.S. ——, 104 S.Ct. 3244, 3253–55, 82 L.Ed.2d 462 (1984), important state interests have historically yielded to the limitations of the First Amendment, *Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (state interest in educated populace). Further, the highly intrusive nature of the remedies available to the Commission, Ohio Rev. Code Ann. § 4112.05(G) (backpay, reinstatement) and the probing and inquiry into decisions regarding religious activities made on religious grounds highlight the need for a careful consideration of whether there are less burdensome means by which the state might further even a concededly substantial interest. Accordingly, it is clear that the Commission's exercise of jurisdiction implicates a serious constitutional question with respect to the Free Exercise Clause of the First Amendment.

■ Likewise, there is a serious question regarding whether the state's inquiry into a religious school's decision on the religious qualifications of a religious instructor constitutes impermissible entanglement of the state in religious affairs in violation of the Establishment Clause. The Court has recognized the high likelihood of impermissible entanglement in state interaction with pervasively religious elementary schools, *Lemon v. Kurtzman (Lemon I)*, 403 U.S. 602, 616, 91 S.Ct. 2105, 2113, 29 L.Ed.2d 745 (1971), especially when that interaction leads to the continuing surveillance implicated by the conciliation agreement proposed by the Commission, *Lemon I*, 403 U.S. at 619, 91 S.Ct. at 2114. Further, the specter of impermissible entanglement arises when the state, as in this case, seeks to monitor or evaluate decisions or activities of the school which necessarily implicate religious doctrine. *See Volunteers of America-Minnesota-Bar None Boys*

§ 28–5–6(B) (1981); Utah Code Ann. § 34–35–2(5) (1979); Wash.Rev.Code Ann. § 49.60.040

(1961); Wyo.Stat. § 27–9–102(b) (1965). However, *see* Ga.Code Ann. § 34–5–3 (1966); N.C. Gen.Stat. § 143–422.1–3 (1977).

*Ranch v. NLRB*, 752 F.2d 345, 349 (8th Cir.1985), *petition for cert. filed*, —— U.S. ——, 105 S.Ct. 3502, 87 L.Ed.2d 633 (1985) (no entanglement). Accordingly, in light of these serious constitutional questions, we consider whether the Ohio General Assembly intended to regulate the employment decisions of religious institutions.[19]

■ While the Act reflects no so-called "affirmative" expression of intent to include religious schools within the purview of the statutory proscriptions, to interpret the Act as inapplicable to religious schools would render illusory the plain meaning of its words and provisions. It is clear that the Ohio General Assembly exempted discrimination based on religion from those portions of the statute deemed desirable. With respect to some of the statutory prohibitions, the legislature provided that an employer might obtain a certification that religion was a bona fide occupational qualification, and, therefore, discriminate on the basis of religion. Section 4112.02(E). Further, with respect to housing discrimination, the legislature exempted religious institutions from the statutory prohibition "from giving preferences to persons of the same religion ... or from making such selection as calculated by such organization to promote the religious principles or the aims, purposes, or fraternal principles for which it is established or maintained." Sections 4112.02(H), (K). The acts with

which DCS is charged fall within neither of these exemptions.[20] The Act's definition of "employer" is broad and all-inclusive, indicating no intent to exempt religious employers. *See Tilton*, 403 U.S. at 677, 91 S.Ct. at 2095 (absence of statutory reference to religious affiliation or nonaffiliation indicates that "institutions of higher education" includes church-related institutions). Accordingly, the statute asserts a clear expression of intent to apply the prohibitions at issue in this case to all employers, including religious institutions.[21] Even under the analysis of *Catholic Bishop*, we cannot avoid the constitutional questions posed here. Therefore, we consider whether the Act may be applied to DCS consistent with the commands of the First Amendment.

### IV.

■ First among the amendments to our Constitution is the admonishment that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." These prohibitions apply equally to the states and their legislatures as part and parcel of the cherished liberties protected by the Fourteenth Amendment. *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 571, 62 S.Ct. 766, 768, 86 L.Ed. 1031 (1942); *Cantwell v. State of Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

---

19. In this inquiry we are hampered by the absence of published legislative history respecting the enactment of the Ohio Civil Rights Act.

20. The Court has previously inferred an absence of intent to exempt from the lack of a statutory exemption in the Title VII scheme when Congress has provided exemptions for other employers. In *Hishon v. King & Spalding*, —— U.S. ——, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), the Court proceeded to the constitutional inquiry after rejecting the argument that Congress intended to exempt partnership decisions from Title VII. "When Congress wanted to grant an employer complete immunity, it expressly did so." *Id.*, 104 S.Ct. at 2235 (footnote omitted) (citing exemption for religious employees). The intent to extend jurisdiction to partnerships in *Hishon* was no more "affirmative" than the intent in this case.

21. Finding that the Act could not rationally be construed to exclude religious institutions from the prohibitions at issue in this case and rejecting the district court's characterization of the burdens imposed by the Act, we express no opinion with respect to the district court's conclusion that a "lesser showing of affirmative legislative intent is sufficient to support the conclusion that the legislature intended the jurisdiction of OCRC to extend to religious schools such as DCS." 578 F.Supp. at 1024. *See also Church of the Holy Trinity v. United States*, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892) (statute prohibiting importation of immigrant workers not applicable to hiring of minister from Ireland; constitutional question not reached where it would be unreasonable to conclude that Congress intended to proscribe such hiring).

Inquiries into the scope of these prohibitions neither call for rigidity nor allow clearly defined rules. *Walz v. Tax Commission of City of New York*, 397 U.S. 664, 669, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970). Rather, the hallmark of analysis under the religion clauses is flexibility, emphasizing the objectives of the prohibitions, rather than court-refined "tests" for ascertaining their parameters.[22]

22. The Establishment and Free Exercise Clauses of the First Amendment are not the most precisely draw portions of the Constitution. The sweep of the absolute prohibitions in the Religion Clauses may have been calculated; but the purpose was to state an objective not to write a statute. In attempting to articulate the scope of the two Religion Clauses, the Court's opinions reflect the limitations inherent in formulating general principles on a case-by-case basis. The considerable internal inconsistency in the opinions of the Court derives from what, in retrospect, may have been too sweeping utterances on aspects of these clauses that seemed clear in relation to the particular cases but have limited meaning as general principles.
*Walz*, 397 U.S. at 668, 90 S.Ct. at 1411. Likewise, the Court has often recognized the difficult nature of the fine distinctions required in inquiries pursuant to the religion clauses. This difficulty is reflected in the substantial dissents in several religion cases. *Lynch v. Donnelly*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) (5–4); *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) (6–3); *Larson v. Valente*, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982) (5–4); *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298(1981) (5–4); *Stone v. Graham*, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (5–4); *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (5–4); *Committee for Public Education and Religious Liberty v. Regan*, 444 U.S. 646, 662, 100 S.Ct. 840, 850, 63 L.Ed.2d 94 (1980) (5–4); ("Establishment Clause cases are not easy; they stir deep feelings; and we are divided among ourselves, perhaps reflecting the different views on this subject of the people of this country."); *Jones v. Wolf*, 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979) (5–4); *New York v. Cathedral Academy*, 434 U.S. 125, 98 S.Ct. 340, 54 L.Ed.2d 346 (1977) (6–3); *Wolman v. Walter*, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977); *Roemer v. Board of Public Works of Maryland*, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976) (5–4); *Sloan v. Lemon*, 413 U.S. 825, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973) (6–3); *Committee for Public Education and Religious Liberty v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); *Hunt v. McNair*, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923

Although the clauses "are cast in absolute terms," *Walz*, 397 U.S. at 668, 90 S.Ct. at 1411, "[n]o perfect or absolute separation is really possible," *id.* at 670, 90 S.Ct. at 1412 and "if expanded to a logical extreme, [each clause] would tend to clash with the other," *id.* at 668–69, 90 S.Ct. at 1411; *Engel v. Vitale*, 370 U.S. 421, 430, 82 S.Ct. 1261, 1267, 8 L.Ed.2d 601 (1962).[23] " 'Establishment' and 'free exercise' were

(1973) (6–3); *Lemon v. Kurtzman (Lemon II)*, 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973) (4–3); *Tilton v. Richardson*, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) (5–4); *Board of Education of Central School Dist. No. 1 v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) (6–3); *School District of Abington Township v. Schempp*, 374 U.S. 203, 246, 83 S.Ct. 1560, 1584, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring) ("If the choice is often difficult, the difficulty is endemic to issues implicating the religious guarantees of the First Amendment."); *Braunfeld v. Brown*, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961) (6–3); *Zorach v. Clauson*, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952) (6–3); *Everson v. Board of Education of Ewing Twp.*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (5–4).

23. The "wall of separation" which the clauses have been construed to compel arose from the writings of Jefferson.
"Believing with you that religion is a matter which lies solely between man and his God, that he owes account to none other for his faith or his worship, that the legislative powers of government reach actions only, and not opinions, I contemplate with sovereign reverence that act of the whole American people which declared that their legislature should 'make no law respecting an establishment of religion, or prohibiting the free exercise thereof,' thus building a wall of separation between church and State."
*People of State of Illinois ex rel. McCollum v. Board of Education*, 333 U.S. at 244–45 n. 8, 68 S.Ct. at 481 n. 8 (1948). "Jefferson's metaphor in describing the relation between Church and State speaks of a 'wall of separation,' not of a fine line easily overstepped." *Id.* at 231, 68 S.Ct. at 475; *Nyquist*, 413 U.S. at 761, 93 S.Ct. at 2959 ("as of necessity, the 'wall' is not without bends"). *See Lynch*, 104 S.Ct. at 1359 ("The concept of a 'wall' of separation is a useful figure of speech.... But the metaphor itself is not a wholly accurate description of the practical aspects of the relationship that in fact results between church and state."); *Walz*, 397 U.S. at 672, 90 S.Ct. at 1413 ("This is a 'tight rope' and one we have successfully traversed."); *Sherbert v. Verner*, 374 U.S. 398, 402, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963) ("The door of

correlative and coextensive ideas, representing only different facets of the single great and fundamental freedom." *Everson v. Board of Education of Ewing Township,* 330 U.S. 1, 40, 67 S.Ct. 504, 523, 91 L.Ed. 711 (1947) (Rutledge, J., dissenting); *School District of Abington Township v. Schempp,* 374 U.S. 203, 232, 83 S.Ct. 1560, 1576, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring) ("The inclusion of both restraints upon the power of Congress to legislate concerning religious matters shows unmistakably that the Framers of the First Amendment were not content to rest the protection of religious liberty upon either clause." ).

the Free Exercise Clause stands tightly closed against any governmental regulation. . . ."); *Abington,* 374 U.S. at 225, 83 S.Ct. at 1573 ("The breach of neutrality that is today a trickling stream may all too soon become a raging torrent. . . ."); *Everson,* 330 U.S. at 63, 67 S.Ct. at 534 (Rutledge, J., dissenting) ("We should not be less strict to keep strong and untarnished the one side of the shield of religious freedom than we have been of the other."); *Cantwell,* 310 U.S. at 310, 60 S.Ct. at 906 ("The essential characteristic of these liberties is, that under their shield many types of life, character, opinion and belief can develop unmolested and unobstructed."); *Catholic High School Association of New York v. Culvert,* 753 F.2d 1161, 1166 (2d Cir.1985) ("If we allow the camel to stick its nose into the constitutionally protected tent of religion, what will follow may not always be controlled. Thus, we must now turn to the question of whether the camel can be kept firmly tethered outside.").

24. The Court has frequently applied the religion clauses in the educational context, *Bob Jones University v. United States,* 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983); *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); *Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980); *Committee for Public Education and Religious Liberty v. Regan,* 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980); *New York v. Cathedral Academy,* 434 U.S. 125, 98 S.Ct. 340, 54 L.Ed.2d 346 (1977); *Wolman v. Walter,* 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977); *Roemer v. Board of Public Works of Maryland,* 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976); *Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); *Johnson v. Robison,* 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); *Sloan v. Lemon,* 413 U.S. 825, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973); *Committee for Public Education and Religious Liberty v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); *Hunt v. McNair,*

Accordingly, we consider the limitations both clauses place on the state's legislative power in this case.[24]

## A.

Consideration of a challenge to governmental action under the Free Exercise Clause requires that first we identify the nature and extent to which the state action interferes with or burdens the free exercise of appellants' religious beliefs. *Alamo Foundation,* 105 S.Ct. at 1963; *United States v. Lee,* 455 U.S. 252, 256–57, 102 S.Ct. 1051, 1054–55, 71 L.Ed.2d 127 (1982). "A regulation neutral on its face may, in its application, nonetheless offend the consti-

413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973); *Levitt v. Committee for Public Education and Religious Liberty,* 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973); *Lemon v. Kurtzman (Lemon II),* 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973); *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Lemon v. Kurtzman (Lemon I),* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971); *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); *Board of Education of Central School District No. 1 v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968); *School District of Abington v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); *Zorach v. Clauson,* 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952); *People of State of Illinois ex rel. McCollum v. Board of Education,* 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948); *Everson v. Board of Education of Ewing Twp.,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947); *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943); *Minersville School District v. Gobitis,* 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375 (1940) (overruled by *Barnette* ); *Hamilton v. Regents of University of California,* 293 U.S. 245, 55 S.Ct. 197, 79 L.Ed. 343 (1934), finding two general categories of religion/education cases: attempts by the state to introduce religious activities into public schools and attempts by the state to provide aid to religious schools. *Nyquist,* 413 U.S. at 772, 93 S.Ct. at 2965. For a history of religious education in America, *see People of State of Illinois ex rel. McCollum v. Board of Education,* 333 U.S. 203, 212, 68 S.Ct. 461, 465, 92 L.Ed. 649 (1948) (Frankfurter, J.). However, the instant case falls in neither of these categories but instead involves state interference in the religious activities of religious schools.

tutional requirement for governmental neutrality if it unduly burdens the free exercise of religion." *Yoder*, 406 U.S. at 220, 92 S.Ct. at 1535. Second, "[t]he state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest." *Lee*, 455 U.S. at 257–58, 102 S.Ct. at 1055; *Yoder*, 406 U.S. at 214, 92 S.Ct. at 1532. Inherent in determining whether the limitation is essential to the governmental interest is consideration of whether accommodation by the state would "unduly interfere with fulfillment of the governmental interest," *Lee*, 455 U.S. at 259, 102 S.Ct. at 1056, and whether the governmental regulation is the "least restrictive means" of promoting the governmental interest, *Thomas v. Review Board of Indiana Employment Security*, 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981); *Braunfeld v. Brown*, 366 U.S. 599, 607, 81 S.Ct. 1144, 1148, 6 L.Ed.2d 563 (1961). Accordingly, we consider the burden placed on appellants' religious beliefs by allowing the OCRC to exercise jurisdiction, the state's interest in enforcement of the Ohio Civil Rights Act, and the necessity of regulating DCS employment practices in order to promote the state's interest.

### (a)

Several factors compel a conclusion that the burden on appellants' exercise of their religious beliefs by allowing the state to regulate the employment practices of a pervasively religious school is great.

Foremost, perhaps, are the fundamental rights of Stephen and Camillia House, as parents, to choose the manner in which their children will be educated, especially with regard to religious values. This fundamental right has been recognized in circumstances where First Amendment concerns were not predominant. *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925). In *Pierce*, the Court held that government, pursuant to the equal protection clause of the Fourteenth Amendment, may not compel attendance in public, as opposed to private, schools. "The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id.* at 535, 45 S.Ct. at 573. These "additional obligations" "must be read to include the inculation of moral standards, religious beliefs, and elements of good citizenship." *Yoder*, 406 U.S. at 233, 92 S.Ct. at 1542. The contemporary Court has found that "*Pierce* stands as a charter of the rights of parents to direct the religious upbringing of their children." *Id.* This parental interest is particularly compelling combined with a free exercise claim. *Id.;* [25] *Grove v.*

---

**25.** The Court has frequently recognized this parental interest in both religious and non-religious contexts. In *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), the Court held that a state law forbidding, in any school, the teaching of any language other than English to a child who has not passed the eighth grade, violated the Fourteenth Amendment's guarantee of liberty. The Court found that "education of the young is only possible in schools conducted by especially qualified persons who devote themselves thereto," and that the teacher's "right thus to teach and the right of parents to engage him so to instruct their children, we think, are within the liberty of the Amendment." *Id.* at 400, 43 S.Ct. at 627. This due process right of parents existed independent of religious considerations. In *Pierce*, the Court invalidated a statute requiring that children attend public schools as interfering with "the liberty of parents and guardians to direct the upbringing and education of children under their control." 268

U.S. at 534–35, 45 S.Ct. at 573. Further, in *Prince v. Commonwealth of Massachusetts*, 321 U.S. 158, 165, 64 S.Ct. 438, 441, 88 L.Ed. 645 (1944), the Court reiterated "[t]he rights of children to exercise their religion, and of parents to give them religious training and to encourage them in the practice of religious belief, as against preponderant sentiment and assertion of state power voicing it." The function of the parent includes "preparation for obligations the state can neither supply nor hinder." *Id.* at 166, 64 S.Ct. at 442. See also *Quick Bear v. Leupp*, 210 U.S. 50, 81–82, 28 S.Ct. 690, 699–700, 52 L.Ed. 954 (1908) ("we cannot concede the proposition that Indians cannot be allowed to use their own money to educate their children in the schools of their own choice because the Government is necessarily undenominational."). The Court has more recently found the parental right of child rearing and education in the implied right of privacy, *Roe v. Wade*, 410 U.S. 113, 152–53, 93 S.Ct. 705, 726, 35 L.Ed.2d 147

*Mead School District,* 753 F.2d 1528, 1533 (9th Cir.1985) ("The free exercise clause recognizes the right of every person to choose among types of religious training."); *Hamilton v. Regents of University of California,* 293 U.S. 245, 262, 55 S.Ct. 197, 204, 79 L.Ed. 343 (1934) (religious liberty includes "the right to entertain the beliefs, to adhere to the principles and to teach the doctrines"). "[T]he Free Exercise Clause ... recognizes the value of religious training, teaching and observance and, more particularly, the right of every person to freely choose his own course with reference thereto, free of any compulsion from the state." *School District of Abington v. Schempp,* 374 U.S. 203, 222, 83 S.Ct. 1560, 1571, 10 L.Ed.2d 844 (1963). *Cf. Epperson v. Arkansas,* 393 U.S. 97, 106, 89 S.Ct. 266, 271, 21 L.Ed.2d 228 (1968) ("There is and can be no doubt that the First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma."). *See also Norwood v. Harrison,* 413 U.S. 455, 461, 93 S.Ct. 2804, 2808, 37 L.Ed.2d 723 (1973) ("a State's role in the education of its citizens must yield to the right of parents to provide an equivalent education for their children in a privately operated school of the parents' choice."). "[A] state law interfer-

ing with a parent's right to have his child educated in a sectarian school would run afoul of the Free Exercise Clause." *Committee for Public Education and Religious Liberty v. Nyquist,* 413 U.S. 756, 788, 93 S.Ct. 2955, 2973, 37 L.Ed.2d 948 (1973).

The claims of the Amish parents in *Yoder* are similar in kind to those of appellants in that the Amish parents objected to the values to which their children would be exposed in public high school, in the same way that appellants object to the state's attempt to regulate DCS hiring practices with the result of coercing the school into retaining or hiring teachers whose lifestyles and actions conflict with the parents' basic religious beliefs.[26]

The tender ages of the children exposed to Linda Hoskinson likewise compels the conclusion that the state interference with DCS selection of religious role models constitutes a substantial burden on religious freedom. For, "the values of parental direction of the religious upbringing and education of their children in their early and formative years have a high place in our society." *Yoder,* 406 U.S. at 213–14, 92 S.Ct. at 1532;[27] *Lemon I,* 403 U.S. at 616, 91 S.Ct. at 2113 ("This process of inculcating religious doctrine is, of course, enhanced by the impressionable age of the

(1973), while expressing confusion regarding the source of such right, *Runyon v. McCrary,* 427 U.S. 160, 178 n. 15, 96 S.Ct. 2586, 2598 n. 15, 49 L.Ed.2d 415 (1976). In *Runyon,* the Court found that "a parent's decision concerning the manner in which his child is to be educated may fairly be characterized as exercises of familial rights and responsibilities" and that "parents have a constitutional right to send their children to private schools and a constitutional right to select private schools that offer specialized instruction." *Id.* at 178, 96 S.Ct. at 2598. In *Yoder,* the Court emphasized that "when the interests of parenthood are combined with a free exercise claim of the nature revealed by this record, more than merely a 'reasonable relation to some purpose within the competency of the State' is required to sustain the validity of the State's requirement under the First Amendment." *Yoder,* 406 U.S. at 233, 92 S.Ct. at 1542. We do not evaluate this case under a due process challenge with respect to the parents' privacy rights since the parties have not raised such a claim.

**26.** In *Yoder,* the Amish "object to the high school, and higher education generally, because the values they teach are in marked variance with Amish values and the Amish way of life; they view secondary school education as an impermissible exposure of their children to a worldly influence in conflict with their beliefs." 406 U.S. at 210–11, 92 S.Ct. at 1530–31. Further, "high school attendance with teachers who are not of the Amish faith—and may even be hostile to it—interposes a serious barrier to the integration of the Amish child into the Amish religious community." *Id.* at 211–12, 92 S.Ct. at 1531. From these premises, the Court found that the "conclusion is inescapable that secondary schooling ... contravenes the basic religious tenets and practices of the Amish faith." *Id.* at 218, 92 S.Ct. at 1534.

**27.** *Yoder* dealt with secondary school age children from grades 8 and up, while it is uncontroverted that Hoskinson taught elementary school students.

pupils, in primary schools particularly."); *Tilton,* 403 U.S. at 686, 91 S.Ct. at 2099.

Similarly, the importance of religion in the school's educational process and the unique role of the teacher in these religious schools further emphasizes the burdensome nature of the state's actions. *Catholic Bishop of Chicago,* 440 U.S. at 501, 99 S.Ct. at 1319; *Lemon I,* 403 U.S. at 617, 91 S.Ct. at 2113. The record clearly indicates that the school, parents, and teachers expect teachers to serve as examples to the students.[28] Superintendent Schindler testified that teachers previously had been discharged on account of their lifestyles, and the statement of the school's educational philosophy indicates that the student "interacts and is taught by parent and teacher models who are themselves born again and have this perspective on life." The record is replete with evidence that the educational process at DCS is suffused with religion.[29] The district court so found, and there is no evidence to the contrary.

■ Our conclusion that the OCRC's exercise of jurisdiction in this case is extremely burdensome on appellants' exercise of religion is significantly influenced by the affirmative and highly coercive nature of the state interference. The hallmark of a free exercise violation is the presence of coercion by the state.[30] *School District of*

---

**28.** Hoskinson testified that "I try to have a consistent spiritual testimony. By doing this I feel that I can be an example to my students."

**29.** Parent House testified:

The coaches have a very high influence on the students, the participants. As a matter of fact, they are instructed not only in the game and in particularly teaching something that will allow the students to have what is called total release. That total release program basically is the participant, the athlete, viewing that Jesus Christ is, in fact, the audience and that everything he does on the athletic field should, in fact, be done that—with the understanding that Christ is actually watching them.

Prior to every soccer game there is a period of prayer. That prayer is somewhat directed, at least in the first of the year when the athletes are somewhat immature in their ability to prayer, by the coach. But the coach encourages each one of the athletes to pray. And there is a time of—a session of prayer where the athletes, in fact, do have prayer, not only before the game but often time after half-time, and certainly after games, after each game.

Further, Paul Pyle, a teacher who had also attended DCS as a student, testified:

But the two things I think stand out most in my mind was the influence of Godly teachers and the way those teachers influenced me to love and respect the word of God. I was exposed day after day to several teachers who loved God and who loved His word. And that influenced the way I love God and love His word.

Superintendent Schindler testified:

We believe very strongly that the teacher's role in education is paramount. In fact, in the Bible, in Luke, Chapter 6, verse 4, it says that after the student has been fully taught, the student will be like the teacher. And that is not just head knowledge, that is life style. In fact, educationally speaking, we feel strongly that more education takes place, more learning takes place in the life style of the teacher than does the curriculum itself. And because of that, we are very, very strongly devoted to getting the right persons in the classrooms teaching to our students, especially if you look at our philosophy. And if I, as a parent, am responsible for my kids and their education, and I am going to be judged accountable some day for that, that it's important as a parent that I am confident that the teacher has control of the minds of my kids and that their philosophy is compatible with mine.

Also, Schindler testified:

[T]he life style of a person is so crucial and important to what is taught and picked up in the classroom. Some educators have stated that better than ninety percent of the learning that takes place in the classrooms comes from the life style of the teacher. It's also been stated that no one lives out of or functions out of a philosophical vacuum, that we base every decision and the way we live based upon certain principles and certain authorities. And because of this, because it is so crucial, we take extra pains. In fact, I feel that one of my major responsibilities in the Dayton Christian School, as superintendent, is to make certain that the people selected to be on our staff are people whose life styles, whose commitment to Christ is compatible with what we want our kids to be taught.

**30.** The danger of coercion by the state was recognized by James Madison, a drafter of the First Amendment, when he remonstrated against a bill proposed in the Virginia General Assembly "'establishing a provision for Teachers of the Christian Religion.'" *Everson v. Board of Education of Ewing Twp.,* 330 U.S. 1, 64, 67 S.Ct. 504, 535, 91 L.Ed. 711 (1947). Madison opposed

*Abington v. Schempp,* 374 U.S. 203, 223, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844 (1963); *Engel v. Vitale,* 370 U.S. 421, 430, 82 S.Ct. 1261, 1266, 8 L.Ed.2d 601 (1962); *Zorach v. Clauson,* 343 U.S. 306, 311, 72 S.Ct. 679, 682, 96 L.Ed. 954 (1952).

> Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

the law because "we hold it for a fundamental and undeniable truth, 'that Religion, or the duty which we owe to our Creator, and the Manner of discharging it, can be directed only by reason and conviction, not by force or violence.'" *Id.* (footnote omitted). Madison further found that the bill

> degrades from the equal rank of Citizens all those whose opinions in Religion do not bend to those of the Legislative authority. Distant as it may be, in its present form, from the Inquisition it differs from it only in degree. The one is the first step, the other the last in the career of intolerance. The magnanimous sufferer under this cruel scourage in foreign Regions, must view the Bill as a Beacon on our Coast, warning him to seek some other haven, where liberty and philanthropy in their due extent may offer a more certain repose from his troubles.

*Id.* at 69, 67 S.Ct. at 537. For the complete text of Madison's *Memorial and Remonstrance Against Religious Assessments,* see *Everson,* 330 U.S. at 63, 67 S.Ct. at 534. Further, Jefferson, in the Virginia Bill for Religious Liberty, recognized that "'even the forcing him to support this or that teacher of his own religious persuasion, is depriving him of the comfortable liberty of giving his contributions to the particular pastor, whose morals he would make his pattern.'" *Id.* at 13, 67 S.Ct. at 510.

**31.** We recognize that an order of reinstatement or backpay is not at issue in this case. Appellants challenge only the OCRC's exercise of jurisdiction and its issuance of the complaint in this case. We examine, however, the entire statutory scheme, for perhaps a greater burden on appellants is the chilling knowledge that their selection of instructors to teach their children will be reevaluated, and, perhaps, adjusted by the state applying secular criteria. In *Catholic Bishop of Chicago v. NLRB,* 559 F.2d 1112, 1124 (7th Cir.1977), *aff'd on other grounds,* 440

*Thomas,* 450 U.S. at 717–18, 101 S.Ct. at 1432; *Sherbert v. Verner,* 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963). Similarly, when the state penalizes particular hiring practices with respect to an individual employed to provide religious instruction and act as a religious role model when the employment is governed by religious principles, a burden on religion exists.

Our assessment of the burden placed on appellants by the OCRC's exercise of jurisdiction begins with examination of the Commission's preliminary actions in this case.[31] In response to the filing of Hoskinson's charge, the Commission sought from

U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), the court noted

> The real difficulty is found in the chilling aspect that the requirement of bargaining will impose on the exercise of the bishops' control of the religious mission of the schools. To minimize friction between the Church and the Board, prudence will ultimately dictate that the bishop tailor his conduct and decisions to "steer far wider of the unlawful zone" of impermissible conduct.... If, for example, a teacher should give a strong pro-union speech at a meeting one week, and the next week would advocate the cause of birth control to his or her students or favor the availability to poor people of abortion, the bishop would be confronted with a choice of foregoing his right to discharge the heretical employee or do so at the risk of a protracted and expensive unfair labor practice proceeding before the Board which would certainly in part involve the Church's religious policies and beliefs.

Similarly, in *Surinach v. Pesquera de Busquets,* 604 F.2d 73, 75–76 (1st Cir.1979) (footnotes omitted), the court held

> It is not the obligation of the schools to prove as a precondition for relief at this time that this precise scenario, which hardly can be called speculative, in fact will unfold. To the contrary, in the sensitive area of First Amendment religious freedoms, the burden is upon the state to show that implementation of a regulatory scheme will *not* ultimately infringe upon and entangle it in the affairs of a religion to an extent which the Constitution will not countenance. In cases of this nature, a court will often be called upon to act in a predictive posture; it may not step aside and await a course of events which promises to raise serious constitutional problems.

*See also Larson v. Valente,* 456 U.S. 228, 241, 102 S.Ct. 1673, 1681, 72 L.Ed.2d 33 (1982). The Court has consistently considered the effect of granting or denying an exception on the overall operation of the statute beyond the specific con-

DCS blank employment applications, employee handbooks and rules and regulations, DCS written policy on disciplinary actions, employee pregnancies, employee evaluations, performance standards, contract renewal, grievance procedure, job descriptions, detailed information regarding all DCS employees who were pregnant from January 1, 1977 to date of request, similar information regarding all employees who were discharged and suspended, minutes of specific DCS Board meetings, and complete personnel files for 14 DCS employees. The Commission, in fact, early in the case used its investigative powers and asserted jurisdiction as coercive tools to compel appellants to relinquish the mandates of their consciences. In a letter of May 14, 1979, the OCRC Regional Director Rebecca Haley warned Schindler that "we encourage you to reconsider adjustment of this matter in lieu of a potentially costly and time consuming investigation." *See* note 31 *supra.* The OCRC likewise attempted to coerce DCS into acceptance of a Conciliation Agreement and Consent Order following the Commission's finding of probable cause. On January 28, 1980, Haley wrote, "the enclosed proposed Conciliation Agreement and Consent Order has been prepared to eliminate unlawful discriminatory practices and their efforts [sic] and to assure your voluntary compliance with Ohio's Laws Against Discrimination." Further, "[y]our refusal to meet with us as suggested ... shall result in a determination being made by the Commission that conciliation efforts have failed. Such a failure will require the Commission to initiate formal proceedings against you or your organization." [32]

The Proposed Consent Order required that DCS bind itself and its successors and to stipulate "that the Commission has full and complete jurisdiction of the parties and

subject matter herein." While noting that the employer does not admit to unlawful conduct, the Consent Order required that Hoskinson be fully reinstated with back pay, that DCS agree not to discharge Hoskinson without "just cause," and that DCS not retaliate against Hoskinson. The order required DCS to further agree to administer its policies without regard to its employees' religion and that it not seek information about its employees' religion. The order also provided that "[r]espondent shall post in a conspicuous place or places on its premises, the Commission's mandatory notice which sets forth excerpts of Chapter 4112, Ohio Revised Code, and other relevant information." The order further provided:

> the Commission may conduct such compliance reviews during Respondent's normal business hours as the Commission believes to be warranted during the three (3) years subsequent to the issuance of this PROPOSED ORDER. Respondent agrees to furnish whatever information is required by the Commission in order to implement such reviews, and understands that upon failure to fully comply with any of the terms and conditions of this PROPOSED ORDER the Commission may initiate further action including, but not necessarily limited to, the filing of a complaint for enforcement of this ORDER in an appropriate Court of Common Pleas.

It is clear that this relief not only collides with the principles underlying appellants' asserted religious beliefs, but could not be constitutionally compelled without running afoul of the First Amendment.[33]

Appellants have few options. They can abandon their religious beliefs by placing their children in public schools, compromise their hiring practices to conform with the

---

sequences of the pending case. *Lee,* 455 U.S. at 260, 102 S.Ct. at 1056.

**32.** We do not suggest that the OCRC's efforts against DCS were more coercive than against other employers. However, this fact is irrelevant since DCS asserts a free exercise claim rather than an equal protection claim.

**33.** It would indeed be curious if the Establishment Clause prohibited the posting of religious commandments in a public school, *Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980), but the correlative scope of the Free Exercise Clause did not prevent the posting of secular commands, directly hostile to appellants' religion, in a parochial school.

state's secular interests rather than appellants' religious commands, or leave Ohio and seek another jurisdiction in which appellants can maintain schools consistent with their religious principles.[34] The Ohio statute "affirmatively compels them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs." *Yoder*, 406 U.S. at 218, 92 S.Ct. at 1534; [35] *Sherbert*, 374 U.S. at 402, 83 S.Ct. at 1792.

The OCRC's exercise of jurisdiction is burdensome on all parties to this action. While DCS primarily bears the expensive and time-consuming burden of answering the OCRC's charges, this burden is indirectly borne by the parents and churches which support DCS. Further, the congregations and parents are faced essentially with either supporting a school staffed by faculty who flout basic tenets of their religion or abandoning their support of Christian education altogether. The burden on the parents' exercise of religion is particularly onerous in light of the heightened parental interest in their children's education. Likewise, teacher Pyle, as an adherent of the school's educational and religious philosophies, finds his exercise of religion as a member of the faculty burdened by the OCRC's intrusion into the faculty-selection process and the imposition of secular guidelines for faculty retention.

The coercion inherent in the Ohio statute and the attendant OCRC exercise of jurisdiction is certainly more affirmative and compelling than that in *Bob Jones University v. United States*, 461 U.S. 574, 103

S.Ct. 2017, 76 L.Ed.2d 157 (1983). In *Bob Jones*, the Court upheld denial of tax exempt status to an institution which denied admission to those engaged in interracial dating. In weighing the school's free exercise claim, the Court observed that "[d]enial of tax benefits will inevitably have a substantial impact on the operation of private religious schools, but will not prevent those schools from observing their religious tenets." *Id.* at 603–04, 103 S.Ct. at 2034–35. In the instant case, however, appellants do not have the luxury of simply declining a public benefit. While Bob Jones University is free to continue to practice its religious beliefs free of state intervention, appellants only have the option of either conforming their religiously based employment practices to the secular guidelines promulgated in the Ohio statute or face continued harassing prosecution by the OCRC. This result is inevitable in light of the absence of a statutory exemption in the Ohio statute, *see* note 18 *supra*, and the Commission's rejection of the religious interests as bars to exercise of its remedial powers.[36] Accordingly, we conclude that the OCRC's exercise of jurisdiction over the complaint against DCS affirmatively and coercively burdens appellants' exercise of their religious beliefs and their attempts to instill such in their offspring.

**(b)**

The state, in pursuit of a compelling interest, may burden religious practices. *Lee*, 455 U.S. at 257, 102 S.Ct. at 1055; *Roemer*, 426 U.S. at 745, 96 S.Ct. at 2344; *Gillette v. United States*, 401 U.S. 437,

---

**34.** The Court has recognized that "[f]orced migration of religious minorities was an evil that lay at the heart of the Religion Clauses." *Yoder*, 406 U.S. at 218 n. 9, 92 S.Ct. at 1535 n. 9.

**35.** Appellants in *Yoder* were fined $5 each. Ohio law makes violation of Ohio Rev.Code Ann. § 4112.02(A) a third-degree misdemeanor, Ohio Rev.Code Ann. § 4112.99, punishable by sixty days imprisonment or a fine of not more than five hundred dollars, Ohio Rev.Code Ann. § 2929.21(B)(3), (C)(3). While these penalties are not insubstantial, we note that the more coercive, and thus constitutionally impermissible, penalty inheres in the threat of prosecution represented by the OCRC's attempt to exercise

jurisdiction in this case to punish actions based on patently religious grounds. Likewise, in *Yoder*, the impermissible coercion rested in the state's attempt to compel attendance by Amish children in public high schools rather than in the $5 fine. *Wooley v. Maynard*, 430 U.S. 705, 710, 97 S.Ct. 1428, 1433, 51 L.Ed.2d 752 (1977) ("When a genuine threat of prosecution exists, a litigant is entitled to resort to a federal forum to seek redress for an alleged deprivation of federal rights.").

**36.** The Commission's complaint states that "[e]vidence does not indicate that the Ohio Civil Rights Commission lacks jurisdiction over Respondent because it is a religious institution."

462, 91 S.Ct. 828, 842, 28 L.Ed.2d 168 (1971); *Sherbert,* 374 U.S. at 403–04, 83 S.Ct. at 1793–94; *Braunfeld,* 366 U.S. at 603, 81 S.Ct. at 1145; *Cantwell,* 310 U.S. at 304, 306, 60 S.Ct. at 903, 904; *Davis v. Beason,* 133 U.S. 333, 342, 10 S.Ct. 299, 300, 33 L.Ed. 637 (1890) (one may "exhibit his sentiments in such form of worship as he may think proper, not injurious to the equal rights of others");[37] *Reynolds v. United States,* 98 U.S. (8 Otto) 145, 164, 25 L.Ed. 244 (1878) (Congress may prohibit "actions which were in violation of social duties or subversive of good order;" polygamy).[38] However, "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Yoder,* 406 U.S. at 215, 92 S.Ct. at 1533; *West Virginia State Bd. of Ed. v. Barnette,* 319 U.S. 624, 639, 63 S.Ct. 1178, 1186, 87 L.Ed. 1628 (1943) (freedom of religion "susceptible of restriction only to prevent grave and immediate danger to interests which the State may lawfully protect.").

Whether the state's interest is compelling is often judged by reference to state law. *Roberts v. United States Jaycees,* —— U.S. ——, 104 S.Ct. 3244, 3253, 82 L.Ed.2d 462 (1984). Although the absence of legislative history hampers our assessment of the state's interest, the statute equally prohibits discrimination based on race, color, religion, handicap, sex, age and national origin. In *Roberts,* the Court found that the "stigmatizing injury, and the denial of equal opportunities that accompanies it" is as serious when the discrimination is based on sex as when it is based on race, *Roberts,* 104 S.Ct. at 3254, and that the government has a compelling interest in eliminating "discrimination in the distribution of publicly available goods, services, and other advantages," *id.* at 3255.[39] Accordingly, we recognize the state's interest as substantial and compelling.

██ The state also asserts its interest in prohibiting conduct encompassed by the statute's prohibition on discriminating against an employee who opposes unlawful

**37.** It was never intended or supposed that the amendment could be invoked as a protection against legislation for the punishment of acts inimical to the peace, good order and morals of society. With man's relations to his Maker and the obligations he may think they impose, and the manner in which an expression shall be made by him of his belief on those subjects, no interference can be permitted, provided always the laws of society, designed to secure its peace and prosperity, and the morals of its people, are not interfered with. However free the exercise of religion may be, it must be subordinate to the criminal laws of the country, passed with reference to actions regarded by general consent as properly the subjects of punitive legislation.
*Beason,* 133 U.S. at 342–43, 10 S.Ct. at 300–01.

**38.** In *Reynolds,* the Court sought to define the scope of protection of religious freedom by reference to a bill for establishing religious freedom drafted by Jefferson.

In the preamble of this act (12 Hening's Stat. 84) religious freedom is defined; and after a recital "that to suffer the civil magistrate to intrude his powers into the field of opinion, and to restrain the profession or propagation of principles on supposition of their ill tendency, is a dangerous fallacy which at once destroys all religious liberty," it is declared

"that it is time enough for the rightful purposes of civil government for its officers to interfere when principles break out into overt acts against peace and good order." In these two sentences is found the true distinction between what properly belongs to the church and what to the State.
98 U.S. at 163. The Court found that to excuse a man's acts as religious practices would "make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances." *Id.* at 167.

**39.** We note that while *Roberts* spoke of discrimination in regard to "publicly available goods," public resources are not implicated in this case. With specific respect to sex discrimination, we also note that the equal protection standard of scrutiny with respect to race discrimination is stricter than that for sex discrimination. *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976). Further, though not dispositive of the state's interest in eliminating discrimination based on sex, Congress has not found application of the employment discrimination laws to the religious activities of religious institutions necessary or essential to accomplishing the national interest in eliminating discrimination. *See* 42 U.S.C. §§ 2000e–1, 2000e–2(e)(2).

actions. Ohio Rev.Code § 4112.02(I). This state interest is likewise compelling since, if employees were prohibited from opposing discrimination, the effectiveness of the employment discrimination laws would be substantially impaired. One court has found the government interest in preventing retaliation compelling since citizens have "a constitutional right to inform the government of violations of federal law." *Pacific Press*, 676 F.2d at 1280. As we construe it, the First Amendment provides that "Congress shall make no law ... abridging ... the right of the people ... to petition the Government for a redress of grievances." Of course, the right to petition, even as part of the due process guaranteed by the Fourteenth Amendment, applies only to actions by federal or state government which abridge the right to petition and does not reach private actions. █ Finally, we note that although the asserted state interests may be compelling, the state is not constitutionally compelled to enact the statute at issue here. The Constitution prohibits neither private sex discrimination nor private abridgment of the First Amendment right to petition. The state interests at issue here differ markedly from those asserted in *Bob Jones*. In that case, the Court found that "the governmental interest is in denying public support to racial discrimination in education." *Bob Jones University*, 461 U.S. at 604 n. 29, 103 S.Ct. at 2035 n. 29. Certainly, denial of public support to discrimination is a more compelling interest

than eliminating discrimination in the private sector, for the Constitution, through the Fourteenth and Fifth Amendments, *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), affirmatively compels denial of governmental aid to discrimination, *Norwood v. Harrison*, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973) [40] (state aid to private schools that discriminate violates fourteenth amendment.). Accordingly, the governmental interest in *Bob Jones* was greater than in the instant case.

**(c)**

The Ohio Civil Rights Act places a heavy burden on appellants' exercise of their religious beliefs, and, although the state's interest is substantial, that interest does not justify such a broad and onerous limitation. The state legislation must be "essential," "necessary," and the least drastic means to further the state's interest. *Minersville School District v. Gobitis*, 310 U.S. 586, 595, 60 S.Ct. 1010, 1013, 84 L.Ed. 1375 (1940) (overruled in *Barnette*) ("essential"); *Sherbert*, 374 U.S. at 407, 83 S.Ct. at 1795; *McCurry v. Tesch*, 738 F.2d 271, 275–76 (8th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1180, 84 L.Ed.2d 328(1985).

Just as the principle of neutrality guides our inquiries pursuant to the Establishment Clause, accommodation distinguishes our consideration of Free Exercise claims. *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 1359, 79 L.Ed.2d 604 (1984) (Constitution "mandates accommodation, not merely toleration"); [41] *Girouard v. United States*

---

**40.** We note that *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), construing § 1981, did not "present the application of § 1981 to private sectarian schools that practice *racial* exclusion on religious grounds." *Id.* at 167, 96 S.Ct. at 2592 (footnote omitted). Therefore, free exercise interests were not implicated. *Id.* at n. 6.

**41.** While concluding like other courts that the Free Exercise Clause may in some circumstances compel an exemption to employment discrimination laws, *EEOC v. Mississippi College*, 626 F.2d at 485, we also recognize "the danger that an exception from a general obligation of citizenship on religious grounds may run afoul of the Establishment Clause." *Yoder*, 406 U.S.

at 220–21, 92 S.Ct. at 1535–36. We reject this danger for two reasons. First, exceptions necessary to vindicate free exercise rights have overwhelmingly been upheld despite Establishment Clause concerns in light of the important values protected by the Free Exercise Clause. *Id.; Sherbert*, 374 U.S. at 409, 83 S.Ct. at 1796; *Abington*, 374 U.S. at 295, 83 S.Ct. at 1610 (Brennan, J., concurring); *Selective Draft Law Cases*, 245 U.S. 366, 390, 38 S.Ct. 159, 165, 62 L.Ed. 349 (1918).

Second, due to the burden on religion necessary to prove a free exercise claim, the granting of an exception invariably involves less entanglement between church and state than does application of the statute to the religion, absent such an exception. *Widmar v. Vincent*, 454 U.S. 263, 269–70, 102 S.Ct. 269, 274, 70 L.Ed.2d 440

328 U.S. 61, 68, 66 S.Ct. 826, 829, 90 L.Ed. 1084 (1946). Accommodation of the religious beliefs in this case would not significantly interfere with the state's fulfillment of its goal of eradicating discrimination in employment. The state would still be able to regulate all employment practices of non-religious institutions and would be able to regulate the employment practices of religious institutions except where religious belief is implicated. Further, it is clear that less burdensome alternatives such as the denial of tax exemptions as in the *Bob Jones University* case or denial of the use of public school bus transportation are available to help the state accomplish its goal while reducing interference with the exercise of religion. While the record reveals that bus transportation is the only public benefit DCS claims to receive, Ohio Rev.Code Ann. § 3327.01, it is clear that state law provides several other benefits such as textbooks, speech and hearing diagnostic services, physician, nursing, dental and optometric services, and diagnostic psychological services, Ohio Rev.Code Ann. §§ 3317.02.4(P), 3317.06. Likewise, while the record does not detail DCS tax status, the Ohio tax code provides several possible tax exemptions. Ohio Rev.Code Ann. §§ 5709.04, 5709.07, 5709.12. Accordingly, the state might further its interest in eliminating sex discrimination by conditioning receipt of these benefits on compliance with the Ohio Civil Rights Act. Therefore, the state could advance its own compelling interest while imposing a lesser burden on appellants' religious beliefs.

We hold that allowing the OCRC to assert jurisdiction over the instant complaint against DCS when such complaint is based on conduct pursuant to admittedly sincerely held religious beliefs and where the Ohio Civil Rights Act makes no provision for accommodation of those beliefs, unduly burdens the plaintiffs' right to free exercise of religion. This heavy burden and the coercion that naturally results compels the conclusion that the statute cannot constitutionally be applied to DCS. The fact that the Houses' religious beliefs conflict with important secular tenets does not require a different result, for "freedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order." *West Virginia State Board of Education v. Barnette*, 319 U.S. at 642, 63 S.Ct. at 1187.

We note the admonition of the Court that "in safeguarding conscience we are dealing with interests so subtle and so dear, every possible leeway should be given to the claims of religious faith." *Gobitis*, 310 U.S. at 594, 60 S.Ct. at 1012; *Braunfeld*, 366 U.S. at 605, 81 S.Ct. at 1146 (making accommodation is a "delicate task"); *Braunfeld*, 366 U.S. at 610, 81 S.Ct. at 1149 (Brennan, J., dissenting) ("[T]he rights of conscience are, in their nature, of peculiar delicacy, and will little bear the gentlest touch of governmental hand." I

(1981); *Nyquist*, 413 U.S. at 793, 93 S.Ct. at 2975 (property tax exemption "was a product not of any purpose to support or to subsidize, but of a fiscal relationship designed to minimize involvement and entanglement between Church and States."). In this case, as we establish *infra* at 961, application of the statute to DCS with the necessary inquiries into the difficult factual questions of intent, belief, pretext, and motivation involves substantial entanglement between religion and the state. While an exemption for action taken on religious grounds by religious institutions with respect to religious activities may require some entanglement, the degree of entanglement is certainly less than if the statute and the OCRC's full panoply of investigative and remedial powers were applied full force. The Establishment Clause prevents only excessive

entanglement. The accommodation reflected in such an exemption is nothing more than the neutrality that the Establishment Clause compels. *Yoder*, 406 U.S. at 234–35 n. 22, 92 S.Ct. at 1542–43 n. 22. See also *Gillette v. United States*, 401 U.S. 437, 461, 91 S.Ct. 828, 842, 28 L.Ed.2d 168 (1971); *Walz*, 397 U.S. at 673, 90 S.Ct. at 1413 ("The limits of permissible state accommodation to religion are by no means coextensive with the noninterference mandated by the Free Exercise Clause."). Since the district court determined that the religious beliefs asserted were sincere and were the reason for the employment decisions at issue, we leave to another case the extent to which the OCRC may inquire into causation and sincerity in determining whether the employment situation at issue is exempt from OCRC regulation.

Annals of Cong. 730 (Remarks of Rep. Daniel Carroll, August 15, 1789)). Further, "the Constitution may compel toleration of private discrimination in some circumstances." *Norwood,* 413 U.S. at 463, 93 S.Ct. at 2809; *King's Garden, Inc. v. FCC,* 498 F.2d 51, 56 (D.C.Cir.), *cert. denied,* 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1972). Concluding that this is the most compelling of such circumstances, we reverse.

### B.

Appellants also contend that application of the Ohio Civil Rights Act to DCS violates the Establishment Clause. Noting that the Free Exercise and Establishment Clauses are but two aspects of one essential freedom, we consider appellants' assignment of error. At the outset, we note that appellants' religious beliefs are sincerely held and that DCS discharged Hoskinson because of those beliefs. These facts, not appealed by the OCRC as clearly erroneous, were found by the district court.

The Court has eschewed rigidity in Establishment Clause analysis.[42] It is clear, however, that the prohibitions which the clause represents apply equally to government benefits to and burdens on religion. *Lynch,* 104 S.Ct. at 1362; *Bob Jones University,* 461 U.S. at 604, 103 S.Ct. at 2035; *Pacific Press Publishing Co.,* 676 F.2d at 1281; *Southwestern Baptist Theological Seminary,* 651 F.2d at 286; *Mississippi College,* 626 F.2d at 486. The Court has enunciated the guidelines for implementing the clause's purpose as follows.

> In each case, the inquiry calls for line drawing; no fixed, *per se* rule can be framed. The Establishment Clause like the Due Process Clauses is not a precise, detailed provision in a legal code capable of ready application. The purpose of the Establishment Clause "was to state an objective, not to write a statute." ... The line between permissible relationships and those barred by the Clause can no more be straight and unwavering than due process can be defined in a single stroke or phrase or test. The Clause erects a "blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship."
>
> In the line-drawing process we have often found it useful to inquire whether the challenged law or conduct has a secular purpose, whether its principal or primary effect is to advance or inhibit religion, and whether it creates an excessive entanglement of government with religion.... But, we have repeatedly emphasized our unwillingness to be confined to any single test or criterion in this sensitive area.

*Lynch,* 104 S.Ct. at 1361–62 (citations omitted); *Alamo Foundation,* 105 S.Ct. at 1964; *Mueller v. Allen,* 463 U.S. 388, 103 S.Ct. 3062, 3066, 77 L.Ed.2d 721 (1983) (tax deductions for school expenses); *Larkin v. Grendel's Den, Inc.,* 459 U.S. 116, 123, 103 S.Ct. 505, 510, 74 L.Ed.2d 297 (1982); *Larson v. Valente,* 456 U.S. 228, 252, 102 S.Ct. 1673, 1687, 72 L.Ed.2d 33 (1982); *Stone v. Graham,* 449 U.S. at 40, 101 S.Ct. at 193; *Committee for Public Education and Religious Liberty v. Regan,* 444 U.S. 646, 653, 100 S.Ct. 840, 846, 63 L.Ed.2d 94 (1980); *Wolman v. Walter,* 433 U.S. 229, 236, 97 S.Ct. 2593, 2599, 53 L.Ed.2d 714 (1977) (school aid); *Meek v. Pittenger,* 421 U.S. 349, 358, 95 S.Ct. 1753, 1759, 44 L.Ed.2d 217 (1975); *Lemon I,* 403 U.S. at 612–13, 91 S.Ct. at 2111;[43] *Walz,* 397 U.S.

---

**42.** There are always risks in treating criteria discussed by the Court from time to time as "tests" in any limiting sense of that term. Constitutional adjudication does not lend itself to the absolutes of the physical sciences or mathematics. The standards should rather be viewed as guidelines with which to identify instances in which the objectives of the Religion Clauses have been impaired ... [W]e can only dimly perceive the boundaries of permissible government activity in this sensitive area of constitutional adjudication. *Tilton,* 403 U.S. at 678, 91 S.Ct. at 2095.

**43.** In *Lemon I,* the Court also cited, as a basis for a finding of entanglement, the divisive political potential of government aid to parochial schools. 403 U.S. at 622–24, 91 S.Ct. at 2115–17. The scope of the inquiry into political divisiveness has been subsequently limited "to cases where direct financial subsidies are paid to pa-

at 669, 90 S.Ct. at 1411 (property tax exemption); *Abington*, 374 U.S. at 222, 83 S.Ct. at 1571 (Bible reading); *Engel*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (school prayer); *McGowan v. Maryland*, 366 U.S. 420, 442, 81 S.Ct. 1101, 1113, 6 L.Ed.2d 393 (1961) (Sunday closing law); *Braunfeld*, 366 U.S. at 607, 81 S.Ct. at 1147 (Sunday closing laws). *See also Bradfield v. Roberts*, 175 U.S. 291, 297, 20 S.Ct. 121, 123, 44 L.Ed. 168 (1899). With little hesitation, we can affirm the district court's conclusions that the statute has a secular purpose and does not have the primary effect of advancing or inhibiting religion. However, a secular purpose and facial neutrality are not sufficient to avoid conflict with the Establishment Clause. *Stone v. Graham*, 449 U.S. 39, 40–41, 101 S.Ct. at 193–194 (1980); *Roemer*, 426 U.S. at 747, 96 S.Ct. at 2344; *Nyquist*, 413 U.S. at 774, 783 n. 39, 93 S.Ct. at 2966, 2970 n. 39. Therefore, our inquiry focuses on whether the statute fosters excessive entanglement between religion and government.[44]

■ "Entanglement is a question of kind and degree." *Lynch*, 104 S.Ct. at 1364. "[T]he questions are whether the involvement is excessive, and whether it is a continuing one calling for official and continuing surveillance leading to an imper-

missible degree of entanglement." *Walz*, 397 U.S. at 675, 90 S.Ct. at 1414. In assessing entanglement, we consider the character of the institution affected, the type of burden placed upon that institution, and the resulting church-state relationship. *Lemon I*, 403 U.S. at 615, 91 S.Ct. at 2112. These considerations mirror the three levels at which religion is involved in this case. First, the institution, the school, is pervasively religious. Second, the activity being burdened—the teaching of students and hiring of teachers—are in this case pervasively religious activities. Third, the point at which the state attempts to interject itself, thereby creating the church-state relationship, is in the hiring decision, a decision which the school superintendent testified is made using almost exclusively religious criteria. We consider each of these points.

■ First, as we have discussed fully above, DCS is a pervasively religious school, admits only Christians, applies religious criteria in hiring faculty, and includes indoctrination of students as a substantial purpose of its existence. *Tilton*, 403 U.S. at 686–87, 91 S.Ct. at 2099–2100; *Lemon I*, 403 U.S. at 616–618, 91 S.Ct. at 2113 ("The substantial religious character of these church-related schools gives rise to entan-

---

rochial schools or to teachers in parochial schools." *Mueller*, 103 S.Ct. at 3071 n. 11.

Political divisiveness is admittedly an evil addressed by the Establishment Clause. Its existence may be evidence that institutional entanglement is excessive or that a government practice is perceived as an endorsement of religion. But the constitutional inquiry should focus ultimately on the character of the government activity that might cause such divisiveness, not on the divisiveness itself. The entanglement prong of the *Lemon* test is properly limited to institutional entanglement.

*Lynch*, 104 S.Ct. at 1367 (O'Connor, J., concurring). See, however, *Lynch*, 104 S.Ct. at 1374 n. 9 (Brennan, J., dissenting).

44. The opinions of the Court and writings of the drafters reveal the values underlying the clause.

Its first and most immediate purpose rested on the belief that a union of government and religion tends to destroy government and to degrade religion. The history of governmen-

tally established religion, both in England and in this country, showed that whenever government had allied itself with one particular form of religion, the inevitable result had been that it had incurred the hatred, disrespect and even contempt of those who held contrary beliefs. That same history showed that many people had lost their respect for any religion that had relied upon the support of government to spread its faith. The Establishment Clause thus stands as an expression of principle on the part of the Founders of our Constitution that religion is too personal, too sacred, too holy, to permit its "unhallowed perversion" by a civil magistrate.

*Engel v. Vitale*, 37 U.S. at 431–32, 82 S.Ct. at 1267 (footnotes omitted). Madison remonstrated against government involvement arguing that "it will destroy that moderation and harmony which the forbearance of our laws to intermeddle with Religion, has produced amongst its several sects." *Everson*, 330 U.S. at 69, 67 S.Ct. at 537. *See also Epperson*, 393 U.S. at 103–04, 89 S.Ct. at 269–70.

gling church-state relationships. . . ."); *Everson*, 330 U.S. at 33, 67 S.Ct. at 520 (Rutledge, J., dissenting) ("daily religious education commingled with secular is 'religion' "); *Volunteers of America-Minnesota-Bar None Boys Ranch v. NLRB*, 752 F.2d 345, 348–49 (8th Cir.1985), *petition for cert. filed*, 53 U.S.L.W. 3759 (April 23, 1985). "[T]he degree of entanglement arising from inspection of facilities as to use varies in large measure with the extent to which religion permeates the institution." *Hunt v. McNair*, 413 U.S. 734, 746, 93 S.Ct. 2868, 2875, 37 L.Ed.2d 923 (1973); *Meek v. Pittenger*, 421 U.S. at 366, 95 S.Ct. at 1763. Therefore, the religious permeation of DCS indicates that state intervention is likely to result in a high degree of entanglement.

Second, the character of the activity the state seeks to affect—the employment of the teaching staff—necessarily involves the state in regulating ideological resources of the school. *Tilton*, 403 U.S. at 687, 91 S.Ct. at 2100. The fact that the state seeks to regulate teachers necessarily implicates religious concerns.[45] *Lemon I*, 403 U.S. at 617, 91 S.Ct. at 2113. If anything, the Court's decisions regarding state aid to parochial schools establish that teachers are not religiously neutral. *Id.* See *New York v. Cathedral Academy*, 434 U.S. 125, 98 S.Ct. 340, 54 L.Ed.2d 346 (1977);[46] *Meek*, 421 U.S. at 372, 95 S.Ct. at 1766; *Levitt v. Committee for Public Education and Religious Liberty*, 413 U.S. 472, 480, 93 S.Ct. 2814, 2819, 37 L.Ed.2d 736 (1973); *Allen*, 392 U.S. at 248, 88 S.Ct. at 1929. *See also Catholic Bishop*, 440 U.S. at 501, 99 S.Ct. at 1319 ("The key role played by teachers

in such a school system has been the predicate for our conclusions that governmental aid channeled through teachers creates an impermissible risk of excessive governmental entanglement in the affairs of the church-operated schools."); *NLRB v. Bishop Ford Central Catholic High School*, 623 F.2d 818, 822 (2d Cir.1980), *cert. denied*, 450 U.S. 996, 101 S.Ct. 1698, 68 L.Ed.2d 196 (1981) ("It is the commitment of the faculty to religious values no matter what subject in the curriculum is taught and the obligation to propagate those values which provides the risk of entanglement."). *See Donovan v. Central Baptist Church, Victoria*, 96 F.R.D. 4 (S.D.Texas 1982). Therefore, this element of the entanglement inquiry indicates that a high degree of entanglement is likely. *Compare Donovan v. Tony and Susan Alamo Fdn.*, 722 F.2d 397, 402 (8th Cir.), *aff'd*, —— U.S. ——, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985) ("These [record keeping] requirements apply only to commercial activities undertaken with a 'business purpose,' and would therefore have no impact on petitioners' own evangelical activities or on individuals engaged in volunteer work for other religious organizations.").

Third, as long as DCS is in existence, the OCRC may exert jurisdiction over employment disputes, thereby creating a continuing relationship, rather than a one-time state-church encounter. *Tilton*, 403 U.S. at 688, 91 S.Ct. at 2100. This fact, along with the types of records the OCRC seeks and the Commission's subpoena power, create the likelihood that allowing the Commission to exercise jurisdiction will result in the "comprehensive, discriminating, and

---

**45.** Our holding is limited to the hiring decision and religious context presented in this case. We express no opinion with respect to the appropriateness of state efforts to prescribe particular qualifications for parochial school teachers.

**46.** While admittedly the instant case involves an inquiry different from that in *Cathedral Academy* that case emphasizes that intrusions into the teaching function of parochial schools is likely to be entangling.

> [D]etailed inquiry into the subtle implications of in-class examinations and other teaching activities would itself constitute a significant

encroachment on the protections of the First and Fourteenth Amendments. In order to prove their claims for reimbursement, sectarian schools would be placed in the position of trying to disprove any religious content in various classroom materials. In order to fulfill its duty to resist any possibly unconstitutional payment, . . . the State as defendant would have to undertake a search for religious meaning in every classroom examination offered in support of a claim.

434 U.S. at 132–33, 98 S.Ct. at 345.

continuing state surveillance" of which the Court disapproved in *Lemon I,* 403 U.S. at 619, 91 S.Ct. at 2114. Further, the fact that the Commission will often be required to decide questions of intent, motive, causation, and pretext necessarily involves the state in assessing religious decisions. Such state involvement "is fraught with the sort of entanglement that the Constitution forbids. It is a relationship pregnant with dangers of excessive government direction of church schools and hence of churches." *Lemon I,* 403 U.S. at 620, 91 S.Ct. at 2114. In *Walz,* the Court, in upholding a property tax exemption for property used for religious worship, rejected, on grounds of entanglement, conditioning such exemption on social welfare work by the churches.

> To give emphasis to so variable an aspect of the work of religious bodies would introduce an element of governmental evaluation and standards as to the worth of particular social welfare programs, thus producing a kind of continuing day-to-day relationship which the policy of neutrality seeks to minimize. Hence, the use of a social welfare yardstick as a significant element to qualify for tax exemption could conceivably give rise to confrontations that could escalate to constitutional dimensions.

*Walz,* 397 U.S. at 674, 90 S.Ct. at 1414.[47] *See Wolman v. Walter,* 433 U.S. 229, 254, 97 S.Ct. 2593, 2608, 53 L.Ed.2d 714 (1977).

The conclusion that the Commission's assessment of DCS teacher employment decisions is impermissibly entangling is compelled particularly by cases assessing the constitutionality of applying labor relations statutes to parochial schools. In *Catholic Bishop of Chicago v. NLRB,* 559 F.2d 1112 (7th Cir.1977), *aff'd on other grounds,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), the court concluded that exercise of jurisdiction by the NLRB over labor disputes among parochial school teachers fosters impermissible entanglement. The court stated:

> We are unable to see how the Board can avoid becoming entangled in doctrinal matters if, for example, an unfair labor practice charge followed the dismissal of a teacher either for teaching a doctrine that has current favor with the public at large but is totally at odds with the tenets of the Roman Catholic faith, or for adopting a lifestyle acceptable to some, but contrary to Catholic moral teachings. The Board in processing an unfair labor practice charge would necessarily have to concern itself with whether the real cause for discharge was that stated or whether this was merely a pretextual reason given to cover a discharge actually directed at union activity. The scope of this examination would necessarily include the validity as a part of church doctrine of the reason given for the discharge.

*Id.* at 1125 (if the reason for discharge were invalid under church doctrine, this would indicate that the reason asserted for discharge, the religious belief, was pretextual).[48] Further, the Supreme Court, although affirming on different grounds,

---

**47.** "Obviously the more discriminating and complicated the basis of classification for an exemption—even a neutral one—the greater the potential for state involvement in evaluating the character of the organizations." *Walz,* 397 U.S. at 698–99, 90 S.Ct. at 1426–27 (Harlan, J., concurring). *See also Gillette v. United States,* 401 U.S. 437, 457, 91 S.Ct. 828, 840, 28 L.Ed.2d 168 (1971). It is clear that state involvement in resolution of doctrinal issues is absolutely prohibited. *Jones v. Wolf,* 443 U.S. 595, 602–04, 99 S.Ct. 3020, 3024–3026, 61 L.Ed.2d 775 (1979); *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969); *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 714–15, 96 S.Ct. 2372, 2382–83, 49 L.Ed.2d 151 (1976).

**48.** It is further open to question whether as a practical matter a distinction could be drawn between discrimination based on an unlawful purpose and discrimination compelled by a religious belief.

As appellants argue, "*[r]eligious* liberty may embrace forms of discrimination on account of *sex.* As a matter of *religious* principle Dayton Christian Schools ... refuses to classify the sexes as identical...." App. at 128. Clearly, "a belief can be both secular and religious. The categories are not mutually exclusive." *Wiggins v. Sargent,* 753 F.2d 663, 666 (8th Cir.1985) (footnote omitted). "The first amendment presumably protects the area where the two overlap.... We believe that in this case the fact that the notion of white supremacy may be, and

found that application of the statute to parochial schools presented a significant risk of infringing the First Amendment. The Court found that "[i]nevitably the Board's inquiry will implicate sensitive issues that open the door to conflicts between clergy-administrators and the Board, or conflicts with negotiators for unions." 440 U.S. at 503, 99 S.Ct. at 1320. Noting that the schools involved had argued that "their challenged actions were mandated by their religious creeds," *id.* at 502, 99 S.Ct. at 1319, the Court found that

> The resolution of such charges by the Board, in many instances will necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission. It is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions.

*Id.* (footnote omitted).[49]

The district court's factual findings and much of its analysis compels us to find excessive entanglement in this case. The court stated:

> perhaps usually is, secular, in the sense that it is a racist idea, does not necessarily preclude it from also being religious in nature, in the sense that it may be based upon a literal interpretation of Biblical teachings." *Id.* at 666–67 (footnote omitted).

**49.** A conclusion at odds with *Catholic Bishop,* was reached by the Second Circuit in *Catholic High School Association of Archdiocese of New York v. Culvert,* 753 F.2d 1161 (2d Cir.1985) in concluding that the First Amendment did not prohibit a state labor relations board from exercising jurisdiction over labor relations between parochial schools and their lay teachers. *Culvert,* a 2–1 decision, is factually distinguishable because no religious belief was implicated. The court rested its conclusion that entanglement was not excessive on the fact that Board orders were not self-enforcing, and the Board could not compel parties to agree but only to bargain in good faith. *Id.* at 1167. However, when a refusal to bargain is based on a religious belief in one's bargaining stance on a particular issue, the state will necessarily be required to inquire into issues of good faith and the validity of a party's interpretation of their religious belief. This is the type of inquiry disapproved in the *Catholic Bishop* cases. To hold that a state may

Should an individual ... charge that the religious reasons given for dismissal were but a pretext for sex, race, or some other form of unlawful discrimination, then the Commission would have to evaluate the subjective sectarian decision to determine if it was properly made or if the real reason for dismissal was some form of prohibited discrimination.

.    .    .    .    .

Within this procedural framework exists the potential for the Commission to evaluate sectarian decisions, in the context of hearings and investigations, to prohibit adherence to, or at least actions based upon religious tenets, and, in fact, to require the posting of antidiscrimination statements that may run contrary to the members' religious beliefs. In a school which attempts to permeate every lesson and activity with its religious principles and values, such potential intrusion by the state squarely presents a risk of impermissible state entanglement and interference with the members' religious beliefs and practices.

578 F.Supp. at 1022–23.

The Establishment Clause "prohibition was designed comprehensively to prevent

constitutionally compel parties to bargain in derogation of religious beliefs seems a particularly peculiar construction of the First Amendment. The court further reached the inexplicable conclusion that although "the First Amendment prohibits the State Board from inquiring into an asserted religious motive to determine whether it is pretextual," the Board "is still free to determine, using a dual motive analysis, whether the religious motive was in fact the cause of the discharge." 753 F.2d at 1168. Since pretext is essentially an inquiry into causation, this appears to be a distinction without a difference. Nevertheless, even if some principled distinction can be drawn, we fail to see that this would appreciably diminish the level of likely entanglement. Once the OCRC is denied the authority to inquire into issues such as pretext it becomes a "toothless tiger" rendering any exercise of jurisdiction illusory since such jurisdiction would be meaningless. Any inquiry into causation in the particularly compelling religious environment of this case involves excessive state/church entanglement in light of the fact that almost all DCS employment decisions are made on religious grounds.

those official involvements of religion which would tend to foster or discourage religious worship or belief." *Abington,* 374 U.S. at 234, 83 S.Ct. at 1577 (Brennan, J., concurring.). The statute in this case, as applied by the OCRC, clearly operates to discourage the practice of religious belief. The district court discounted this prospective state/church entanglement on the ground that only a hearing was involved at this point. However, the OCRC's aggressive pursuit of DCS raises a "realistic likelihood," *Hunt,* 413 U.S. at 747, 93 S.Ct. at 2876, that not only are the impermissible entanglements of the hearing itself implicated, but, rather, the entire panoply of statutory entanglements from the proposed consent order to the spector of judicial enforcement proceedings must be considered.[50] Entanglement is all the more likely in light of the OCRC's preliminary finding of probable cause. The district court also rejected appellants' claims by finding that the OCRC will only rarely be required to involve DCS in Commission proceedings. However, "[t]he prospect of church and state litigating in court about what does or does not have religious meaning touches the very core of constitutional guarantees against religious establishment, and it cannot be dismissed by saying that it will happen only once." *Cathedral Academy,* 434 U.S. at 133, 98 S.Ct. at 345.

Accordingly, we conclude that allowing the OCRC to exercise jurisdiction over employment discrimination charges against DCS necessarily results in an excessive state/church entanglement due to the issues of good faith and motivation necessarily raised in such proceedings, the pervasively religious nature of the Christian school, the particularly sensitive role of the teacher in explicitly and implicitly fostering

the religious beliefs and values that appellant-parents seek for their children, and the fact that religious considerations pervade the hiring scheme employed by DCS.[51] Therefore, we conclude that application of the Ohio Civil Rights Act in this context impermissibly entangles the state in issues of faith in violation of the Establishment Clause of the First Amendment.

**V.**

To be entitled to permanent injunctive relief from a constitutional violation, a plaintiff must first establish the fact of the violation.... He must then demonstrate the presence of two elements: continuing irreparable injury if the injunction does not issue, and the lack of an adequate remedy at law.... If the plaintiff makes such a showing, the court may grant injunctive relief, but the relief must be no broader than necessary to remedy the constitutional violation.

*Newman v. State of Alabama,* 683 F.2d 1312, 1319 (11th Cir.1982), *cert. denied,* 460 U.S. 1083, 103 S.Ct. 1773, 76 L.Ed.2d 346 (1983). *See Lemon II,* 411 U.S. at 200–01, 93 S.Ct. at 1469; *Christian Schmidt Brewing Company v. G. Heileman Brewing Company,* 753 F.2d 1354 (6th Cir.1985) (preliminary injunction); *Detroit Newspaper Publishers Association v. Detroit Typographical Union No. 18,* 471 F.2d 872, 876 (6th Cir.1972), *cert. denied,* 411 U.S. 967, 93 S.Ct. 2149, 36 L.Ed.2d 687 (1973).

In this case, appellants have established that their First Amendment rights would be violated by allowing the OCRC, in light of the record before the district court, to assert jurisdiction over DCS employment practices premised on religious beliefs. In granting an injunction pending appeal, the

---

50. The district court's concerns that conclusions reached by the OCRC are, at this point, hypothetical is properly answered by the Court's comment in *Catholic Bishop,* that "[i]t is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions." 440 U.S. at 502, 99 S.Ct. at 1319 (footnote omitted); *Catholic Bishop,* 559 F.2d at 1123 ("the very threshold act of certification of the

union necessarily alters and impinges upon the religious character of all parochial schools. No longer would the bishop be the sole repository of authority as required by church law.").

51. We note that most jurisdictions avoid these possible entanglements by exempting religious institutions from compliance with employment discrimination laws. *See* note 18, *supra.*

district court found that "[i]f the proceedings before the OCRC go forward, Plaintiffs face the permanent loss of First Amendment rights, rather than their loss for a minimal period of time." In light of our conclusions today, it is clear that appellants would be irreparably harmed if an injunction is not entered, and would have no adequate remedy at law.

Accordingly, the judgment of the district court is REVERSED and the case REMANDED for proceedings consistent with this opinion.